United States District Court
Southern District of Texas
**ENTERED**
September 29, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| SAM AUTRY FLETCHER, (TDCJ–CID #203766) Petitioner, | § § § § § § | CIVIL ACTION NO 4:21–cv–01867 |
| vs. | § § § | JUDGE CHARLES ESKRIDGE |
| BOBBY LUMPKIN, Respondent. | § § § | |

## MEMORANDUM ON DISMISSAL

The motion by Respondent Bobby Lumpkin for summary judgment is granted. Dkt 50.

The petition by Sam Autry Fletcher for a writ of *habeas corpus* is dismissed with prejudice. Dkt 1. His motion for evidentiary hearing and for counsel are denied. Dkts 59 & 60.

### 1.  Background

Fletcher was charged by indictment with aggravated robbery with a deadly weapon. Dkt 25-3 at 15. A jury found him guilty of aggravated robbery in October 2015, in Cause Number 136973001010 before the 183rd Judicial District Court of Harris County, Texas. Dkt 25-3 at 88.

The First Court of Appeals summarized the pertinent factual background as follows:

A. The Robbery

On December 1, 2012, Hugo Iguirre picked up his wife Ivette from her night job, and they then went to Ivette's brother's house—where they were staying the night—arriving about 3:30 a.m. A small, white SUV sped up and parked behind them.

Ivette believed the vehicle to be a Dodge Nitro or similar model. Four or five men jumped out carrying rifles and claiming to be police. The men were wearing masks, dark clothes and shoes, and police-raid vests. Hugo and Ivette were both struck in the head with guns, and the men threatened to kill them both.

One man then told Ivette to unlock the door to her brother's house. They then woke up Ivette's brother, Luis Villanueva, and his wife Yaneth. Luis testified that, when he woke up to his sister coming into his bedroom, he got up and someone punched him. Luis then saw someone holding his sister at gunpoint with a handgun. Luis testified to seeing at least three men in their bedroom. One was very tall, about 7 feet. Another was around Luis's height of 6 feet. Luis believed from their voices that they were both African American. The third was a little shorter, a little huskier, and spoke with a Hispanic accent. Yaneth testified it was too dark for her to see anyone, but she heard her husband get hit, and they were both then taken into the living room.

The Villanuevas and Aguirres were ordered to lie face down on the living room floor, their hands and feet were bound, and they were repeatedly kicked by the intruders. Yaneth testified that she heard four different male voices that she did not recognize; she believed two were Hispanic and two were African American. She also described the four as wearing masks, dark clothes, dark shoes, and police-raid vests. Like her husband, she noticed one of the men was very tall with a large shape. The man who had put a gun to her head was shorter and somewhat heavy. The others were thin. Luis noticed two additional men later in the burglary.

The intruders ransacked the house, opened Christmas presents, and searched for any valuable items. The family was in fear for their lives, as the

2

intruders threatened to throw gasoline on them and burn them alive, but it turned out they were only carrying water, not gasoline.

After the intruders beat and kicked Luis again, they took Yaneth into the bathroom. She told the intruders that she had $27,000 cash in her closet. In addition to taking that money, the intruders took her wedding ring, a Play Station game console, games, other jewelry, and the money out of the Villanuevas' daughter's piggy bank.

After spending about 45 minutes in the apartment, the intruders untied Luis and took him with them, telling the others that they were doing so as insurance that they would not call the police. After they left, Ivette managed to untie herself, and then untied Yaneth and Hugo. They immediately called the police.

In the meantime, Luis was held at gunpoint on the floor of his own truck while another man drove the truck. After about ten minutes, the men jumped out and untied Luis's hands. The men fled and Luis drove his truck back home, arriving around the same time as the police.

B. Appellant's Apprehension

At 4:45 a.m. that same day, M. Haver, a constable deputy, was dispatched to the home invasion. She spotted what looked like a white Dodge Nitro matching the description of the vehicle that had been broadcast. When she passed the vehicle going the opposite direction, she spotlighted the SUV and at least four people inside the vehicle turned to look at her. She testified that at least three of them were dark skinned, either African American or dark Hispanic. She radioed dispatch and a nearby unit to report that she had located the suspect vehicle. As Haver started to follow the SUV, the driver sped up and tried to evade her. At one point, Deputy Constable P. Gennua picked up

the pursuit. Haver was able to keep the SUV and Gennua's vehicle in her sight at all times. When the SUV stopped on a dead-end street, the driver put it in reverse and all the occupants jumped out as it rolled backwards into a parked car. The occupants fled on foot into a wooded area. Given how dark the area was, Haver was not able to tell the number of people who fled, nor could he identify their ethnicity.

Two K–9 officers arrived and tracked the woods, but their dogs lost the suspects' scents at a set of railroad tracks. C. Marshall, one of the K–9 constable deputies, was called out again, however, after a suspect was located at a nearby rail yard.

Mr. S. Davis, a locomotive engineer with the Union Pacific Railroad, testified that one morning—while he was tying up his locomotive— he was approached by a young man wearing all black. He immediately called his supervisor to report it because the person was trespassing on federal property. Davis provided in-court identification of appellant, testifying that appellant was the person who approached him in the rail yard.

Appellant asked Davis for directions to Interstate 45. Appellant then offered Davis first $10, and then $100 if Davis would drive him to Interstate 45. Davis sent appellant to a safer area of the rail yard, and then called 911 to tell officers where to locate appellant.

Marshall was dispatched to the rail yard, and his dog eventually indicated that it had picked up a suspect's scent. Marshall then spotted a figure in all black hiding behind a tree in some vegetation. When Marshall ordered the suspect to show his hands and got no response, he sent his dog in for apprehension. Marshall explained that process involves the dog grabbing a suspect at one spot and

4

not letting go until an officer approaches. Another officer, Lieutenant Glaze, reached the suspect first and handcuffed him. Marshall then called off his dog. Marshall provided in-court identification of appellant as the suspect that they apprehended near the rail yard.

Marshall testified that he called EMS, as is procedure whenever a dog detains a suspect by biting. While the officers were walking appellant back to their cars, appellant asked for some water. Appellant told Marshall that he was running because he had seen a police helicopter and a police car and that it was the most he had ever run in his life.

Marshall and Glaze then handed off appellant to Sergeant Garza and Lieutenant W. Schultz.

C. Crime Scene Investigation

Harris County Sheriff's Department Sergeant L. Holliday testified that he was the crime scene investigator for the December 1, 2012, burglary and kidnapping incident at the Villanuevas' home.

He first processed the home, finding it in disarray. Electronics were unplugged and stacked on the living room floor, items were strewn out of closets, and drawers from the dressers and nightstands had been dumped upside down on the bed in the master bedroom. Holliday was left with the impression that the house had been thoroughly ransacked. He swabbed some blood-looking spots for DNA, and processed for fingerprints. Moving outside to examine Luis's truck and the area around it, Holliday discovered adhesive tape with hair stuck in it crumpled up in the foliage.

When Holliday next arrived at the secondary crime scene where the white SUV was abandoned, he located a black glove on the ground. Appellant had been taken back to that scene, so Holliday

5

photographed him, as he appeared to have blood on his clothing. Appellant told a different officer that he was six feet, six inches tall. When asked about the blood on him, appellant claimed it was his own blood. Holliday took appellant's clothing into evidence, which included black colored baggy sweatpants, a white-colored muscle shirt, a black shirt, and black tennis shoes. Appellant also had his wallet and $5,900 cash in his possession when he was arrested. That cash was split into bundles and wrapped in small rubber bands.

Holliday also processed the white SUV, a Jeep Liberty. In it, he found (1) a pillowcase (in a pattern he recognized from the Villanueva's household) containing a PlayStation game console and cell phone, (2) a couple of bullet-proof vests with the words "Police" on them, (3) a gold-colored badge labeled "Bounty Hunter," (4) a bandana, (5) a walkie talkie, (6) a pistol-style shotgun, (7) baseball caps labeled "Narcotics," "Police," and "Sheriff," (8) a brown purse containing a HandyCam Camcorder, two male wallets (one containing Luis Villanueva's driver's license) and one female wallet (containing Yaneth Villanueva's driver's license), (9) duct tape, (10) a crowbar, (11) a revolver, (12) a pack of Newport cigarettes, (13) a glove, (14) another cell phone, and (15) cash tied together in bundles.

Holliday asked Deputy Wyatt if he knew appellant's cell phone number, and Wyatt indicated that he did. Holliday then asked Wyatt to call appellant's phone number, and Wyatt's call rang through to one of the cell phones Holliday found in the SUV.

D. Appellant's Statement

Deputy Wyatt conducted a taped interview of appellant. Appellant initially denied any involvement, despite having admitted already that he was

6

running from the police. He later changed his story twice.

He continued to deny being at the Villanuevas' house, but he admitted that he had agreed to meet someone in the cul-de-sac and drive a vehicle for $350. He brought the bandana found in the Jeep to wipe the steering wheel clean because he did not like to leave his fingerprints anywhere.

Appellant stated that he waited much longer than expected, but the white Jeep he was waiting for finally showed up. It drove into the cul-de-sac with police in pursuit. When the Jeep stopped and its occupants jumped out, appellant said he looked inside and saw bundles of cash held together with small pink and black rubber bands that he assumed were drug-house proceeds. He took some of the money, dropping his cell phone in the Jeep in the process. He then ran into the same wooded area as the men who had fled the Jeep.

He admitted knowing that any situation in which was being paid $350 to drive a vehicle was not completely legitimate. He stated his stipulations for driving the SUV were (1) it not be stolen, (2) it be registered, (3) it not have drugs in it, and (4) the men previously driving it had not used it to kill anyone. He explained that the man who hired him to drive the vehicle often liked to quickly change out the car he drove in case he was being followed because of his drug dealing activities.

Appellant then changed his story again, but continued to maintain that he had neither participated in any robbery, nor had he been to the Villanuevas' house. He claimed some Mexican men he did not know picked him up in a black Dodge SUV, then took him to a side street around 3:00 a.m. and parked. Later, a little gray car pulled up behind them. The driver of the Dodge spoke into a

walkie talkie to the person in the gray car. Thirty or forty minutes later, the white Jeep pulled up with a gray pickup truck behind it. Appellant got into the white Jeep, and the other occupants were talking about how someone would be calling the police.

Appellant claims that no one was left behind in the gray pickup truck. According to appellant, five people were in the Jeep, and he described the police vests the other men had with them and the guns they carried. He admitted to taking a significant amount of cash, because one of the other men had dropped it in the Jeep and no one was paying attention. Appellant described the police pursuit of the Jeep, and how he and all the other occupants jumped out of the Jeep and fled into the woods.

E. The Jury's Verdict, the Trial Court's Judgment, and Appellant's Motion for New Trial

The Jury found appellant guilty of aggravated robbery. The punishment phase was to the court. The State introduced evidence of appellant's prior convictions for aggravated assault of a police officer, unauthorized use of a motor vehicle, illegal license or certificate, and armed bank robbery. Appellant introduced sealed mitigating evidence. The court sentenced appellant to 55 years' confinement.

Appellant filed a motion for new trial on the following grounds: (1) "The verdict was decided in a manner that was not a fair expression of the jurors' opinion," (2) "The jury verdict of guilty was against the weight of the law and the evidence," and (3) "Witnesses exist whose testimony could have established the innocence of Defendant, [but] ... were not called by trial counsel." In addition to affidavits attached to the motion for new trial, the trial court took evidence and testimony at a motion for new trial hearing. Ultimately, the trial court

denied the motion, and appellant timely brought this appeal.

*Fletcher v State*, No. 01–15–00966–CR, 2016 WL 6962307, *1–4 (Tex App Houston [1st Dist] Nov 29, 2016, pet refd) (unpublished).

Fletcher elected to have the trial court assess punishment upon conviction by the jury. Dkt 25-3 at 79. The trial court sentenced him to a prison term of fifty-five years. Id at 88.

The First Court of Appeals affirmed his conviction in November 2016. *Fletcher v State*, No. 01–15–00966–CR, 2016 WL 6962307, *6–7 (Tex App Houston [1st Dist] Nov 29, 2016, pet refd) (unpublished).

The Texas Court of Criminal Appeals refused his petition for discretionary review on April 12, 2017. Dkt 25-29 at 1. Fletcher filed a timely motion for rehearing, which was denied on June 7, 2017. Dkt 25-22.

His petition for writ of *certiorari* was denied on March 19, 2018. Supreme Court of United States website.

Fletcher then filed a state application for a writ of *habeas corpus* on March 6, 2019. Dkt 25-44 at 58. The Texas Court of Criminal Appeals denied it without written order on the findings of the trial court without hearing and on the court's independent review of the record on May 5, 2021. Dkt 25-37 at 1.

Fletcher filed this federal petition for a writ of *habeas corpus* in June 2021. Dkt 1. The Honorable Gray Miller denied Respondent's first motion for summary judgment based on limitations in June 2022. Dkt 45. Respondent was ordered to file a second motion for summary judgment addressing the merits of Fletcher's petition. Ibid.

Fletcher contends that his conviction is void for a wide of reasons. These have been reorganized as follows, with indication of the original numbering in parentheses:

1. He was denied his right to counsel during police questioning (ground 1);

2. The evidence at trial was insufficient to support the conviction (ground 2);

3. He was denied due process and equal protection by the State's bad faith breach of an oral dismissal agreement (ground 3);

4. Trial counsel, Cornel A. Williams, rendered ineffective assistance by:

   a. failing to notify the trial courts of the State's breach of the oral dismissal agreement (ground 4);

   b. failing to move for a speedy trial (ground 5);

   c. failing to investigate (ground 6);

   d. failing to move for a probable cause hearing (ground 7);

   e. failing to challenge the State's evidence (ground 8);

   f. failing to "connect the inconsistencies and fabrications . . . omissions . . . and misleading nature" of the State's evidence (ground 9);

   g. failing to impeach the State's witnesses (ground 10);

   h. failing to challenge the chain of custody of the State's evidence or request a jury instruction on the weight of chain-of-custody evidence (ground 11);

   i. failing to object to the State's failure to disclose *Brady* material and failing to move for a continuance once the failure to disclose was revealed (ground 13);

   j. failing to object to the State's intentional tampering with and destruction of evidence (ground 14);

   k. failing to move for a writ of attachment or continuance in order to secure the

10

attendance and testimony of the State's missing witnesses (ground 15);

l.  failing to object to the State's opening argument (ground 16);

m.  failing to challenge the sufficiency of the evidence (ground 17);

n.  failing to investigate available defenses, prepare a viable defense, or advance any defense (ground 18);

o.  failing to allow Fletcher to testify on his own behalf (ground 19);

p.  failing to object to or challenge the prosecutor's misconduct during closing argument (ground 20);

q.  failing to move for a mistrial after jury polling revealed a non-unanimous verdict (ground 21);

r.  failing to stipulate to a proper supplemental Allen charge and failure to object to the court's coercive modified supplemental jury instruction (ground 22);

s.  failing to immediately notify the trial court of juror misconduct (ground 23);

t.  failing to move for a new trial (ground 24);

u.  repeatedly displaying a conflict of interest towards Fletcher (ground 29);

v.  totally failing to advocate on Fletcher's behalf (ground 30);

w.  failing to notify Fletcher of the State's plea offer of eight years (ground 32);

5.  The State violated his right to due process by failing to disclose *Brady* material (ground 12);

6.  Interim appellate counsel was ineffective for failing to "properly prepare for or advocate" for Fletcher in the hearing on his motion for new trial (ground 25); and

11

      7.  Appellate counsel, Thomas J. Lewis, rendered ineffective assistance by:

         a.  failing repeatedly displaying a conflict of interest in favor of trial counsel (ground 26);

         b.  preparing and filing an erroneous appellate brief, "grossly" misstating facts and evidence (ground 27);

         c.  failing to raise and advance meritorious issues (ground 28); and

         d.  totally failing to advocate on Fletcher's behalf (ground 31).

Dkt 1 at 12–47.

The Respondent filed a second motion for summary judgment. Dkt 50. Fletcher has responded. Dkt 58.

### 2. Legal standard

Respondent moves for summary judgment, arguing that grounds thirty and thirty-two are unexhausted and procedurally barred. He argues that the remaining claims by Fletcher lack merit and must be dismissed. Dkt 50 at 1.

For completeness, all claims will be considered on the merits. All trial transcript and other state-court records have previously been provided. Dkt 25.

### a. AEDPA

Fletcher proceeds here *pro se*. A *pro se* petition is construed liberally and isn't held to the same stringent and rigorous standards as pleadings filed by lawyers. See *Martin v Maxey,* 98 F3d 844, 847 n 4 (5th Cir 1996); *Bledsue v Johnson,* 188 F3d 250, 255 (5th Cir 1999).

The Antiterrorism and Effective Death Penalty Act, 28 USC § 2241, *et seq*, governs this federal petition for *habeas corpus*. See *Woodford v Garceau*, 538 US 202, 205–08 (2003); *Lindh v Murphy*, 521 US 320, 335–36 (1997). This has consequences for the standard of review as to disputed questions of both law and fact.

*As to disputed questions of law,* AEDPA bars federal *habeas corpus* relief based upon claims that were adjudicated on the merits by state courts unless the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 USC § 2254(d); see also *Early v Packer*, 537 US 3, 7–8 (2002); *Cobb v Thaler*, 682 F3d 364, 372–73 (5th Cir 2012). The Fifth Circuit holds that a state-court decision is *contrary to clearly established federal law* "if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts." *Gray v Epps*, 616 F3d 436, 439 (5th Cir 2010), citing *Williams v Taylor*, 529 US 362, 404–08 (2002). And the Fifth Circuit holds that *an unreasonable application of federal law* means that the decision is "unreasonable, not merely wrong; even clear error will not suffice." *Escamilla v Stephens*, 602 F Appx 939, 941 (5th Cir 2015, *per curiam*), quoting *White v Woodall*, 572 US 415, 419 (2014). This is a high bar. To satisfy it, a petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v Donald*, 575 US 312, 316 (2015), quoting *Harrington v Richter*, 562 US 86, 103 (2011).

*As to disputed questions of fact,* AEDPA precludes federal relief unless the adjudication by the state court of the merits was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 USC § 2254(d)(2); see also *Martinez v Caldwell*, 644 F3d 238, 241–42 (5th Cir 2011). A state court's factual determinations are "presumed to be correct" unless the petitioner rebuts those findings with "clear and convincing evidence." 28 USC § 2254(e)(1). This presump-

13

tion of correctness extends not only to express factual findings, but also to implicit or "unarticulated findings which are necessary to the state court's conclusion of mixed law and fact." *Murphy v Davis*, 901 F3d 578, 597 (5th Cir 2018), quoting *Valdez v Cockrell*, 274 F3d 941, 948 n 11 (5th Cir 2001).

A federal court reviewing a petition for writ of *habeas corpus* may only consider the factual record that was before the state court when determining the reasonableness of that court's findings and conclusions. *Cullen v Pinholster*, 563 US 170, 180–81 (2011). And the Supreme Court instructs that it "may not characterize these state-court factual determinations as unreasonable 'merely because [it] would have reached a different conclusion in the first instance.'" *Brumfield v Cain*, 576 US 305, 313–14 (2015), quoting *Wood v Allen*, 558 US 290, 301 (2010). To the contrary, § 2254(d)(2) requires the federal court to "accord the state trial court substantial deference." *Brumfield*, 576 US at 314.

A petitioner seeking a writ of *habeas corpus* must also demonstrate injury of a certain character. To warrant relief based on state-court error, a petitioner must show the alleged error had "substantial and injurious effect." *Brecht v Abrahamson*, 507 US 619 (1993); for example, see *Hughes v Quarterman*, 530 F3d 336, 345 (5th Cir 2008). This high bar isn't met where evidence of the defendant's guilt is overwhelming. *Burgess v Dretke*, 350 F3d 461, 472 (5th Cir 2003). There must be more than a mere reasonable possibility that it contributed to the verdict. *Brecht*, 507 US at 638. But where a court is confident the error caused grave harm—or even if the record is evenly balanced in this regard—the petitioner is entitled to relief. See *Fry v Pliler*, 551 US 112 n 3 (2007), citing *O'Neal v McAninch*, 513 US 432, 435 (1995); see also *Robertson v Cain*, 324 F3d 297, 305 (5th Cir 2003).

Last, several other technical or procedural limitations can foreclose federal *habeas corpus* relief. For instance, a federal claim is foreclosed if it is barred because of a failure

to comply with state procedural rules. See *Coleman v Thompson*, 501 US 722 (1991). It is likewise foreclosed if it seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced. See *Teague v Lane*, 489 US 288 (1989).

The scope of federal review on *habeas corpus* is limited by the "intertwined doctrines" of both exhaustion and procedural default. *Bledsue*, 188 F3d at 254. These are intertwined because a failure to exhaust may also result in procedural default.

*As to exhaustion,* the Anti-Terrorism and Effective Death Penalty Act of 1996 requires that a person in custody pursuant to the judgment of a state court generally must exhaust available state remedies prior to filing a petition for a writ of *habeas corpus* in federal court. To meet this requirement "the petitioner must afford the state court a 'fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Bagwell v Dretke*, 372 F3d 748, 755 (5th Cir 2004), quoting *Anderson v Harless*, 459 US 4, 6 (1982). This means that a petitioner must present his claims in a procedurally proper manner to the highest court of criminal jurisdiction in the state, which in Texas is the Texas Court of Criminal Appeals. See *O'Sullivan v Boerckel*, 526 US 838, 844–45 (1999); *Richardson v Procunier*, 762 F2d 429, 432 (5th Cir 1985).

A Texas prisoner may exhaust state court remedies by filing a direct appeal from a judgment of conviction, followed, if necessary, by a petition for discretionary review in the Texas Court of Criminal Appeals. See TRAP 68.1; TCCP art 11.07. A prisoner may also file an application for a writ of *habeas corpus* under Article 11.07 of the Texas Code of Criminal Procedure in the convicting court, which is sent to the Texas Court of Criminal Appeals once the trial court determines whether findings are necessary. See TCCP art 11.07, § 3(c). Texas prisoners must typically exhaust state remedies "by pursuing their claims through one complete cycle of either state direct appeal or post-

conviction collateral" review under Article 11.07. *Busby v Dretke*, 359 F3d 708, 723 (5th Cir 2004).

*As to procedural default,* if a petitioner fails to exhaust state remedies (or to satisfy an exception to exhaustion) and the state court would find the claims procedurally barred, then "there is a procedural default for purposes of federal habeas." *Coleman*, 501 US at 735 n 1; *Williams v Thaler*, 602 F3d 291, 305 (5th Cir 2010), quoting *Bagwell*, 372 F3d at 755. Thus, in line with the text of § 2254(b)(2), a district court reviewing the claims of a *habeas* petitioner who fails to satisfy the exhaustion requirement may dismiss the action on either procedural-default grounds or on the merits. *Trevino v Davis*, 829 F3d 328, 341 (5th Cir 2016). This means that procedural default functions as a "corollary to the habeas statute's exhaustion requirement," similarly constricting the scope of federal review on *habeas corpus*. *Dretke v Haley*, 541 US 386, 392–93 (2004); see also *Coleman*, 501 US at 729.

If a state prisoner presents unexhausted claims, the federal *habeas* court may dismiss the petition. *Whitehead v Johnson*, 157 F3d 384, 387 (5th Cir 1998), citing 28 USC § 2254(b)(1)(A) and *Rose v Lundy*, 455 US 509, 519–20 (1982). If a state prisoner presents a "mixed petition" containing both exhausted and unexhausted claims, the federal *habeas* court may stay the proceedings or dismiss the petition without prejudice to allow the petitioner to return to state court and exhaust his claims. *Rhines v Weber*, 544 US 269, 278 (2005); *Pliler v Ford*, 542 US 225, 227 (2004). Alternatively, the federal *habeas* court may *deny* relief on an unexhausted or mixed claim on the merits, notwithstanding the petitioner's failure to exhaust the remedies available in state court. 28 USC § 2254(b)(2).

### b.   AEDPA and Rule 56

The Fifth Circuit holds, "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v Johnson*, 202 F3d 760, 764 (5th Cir 2000). But where Rule 56 and the rules governing

*habeas corpus* petitions conflict, the latter governs. *Austin v Davis*, 647 F Appx 477, 483 (5th Cir 2016, *per curiam*); see also *Torres v Thaler*, 395 F Appx 101, 106 n 17 (5th Cir 2010, *per curiam*) (citations omitted). As such, the presumption of correctness mandated by § 2254(e)(1) "overrides the ordinary summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmoving party." *Austin*, 647 F Appx at 483 (citation omitted); cf *Anderson v Liberty Lobby*, 477 US 242, 255 (1986) (stating typical summary-judgment standard in civil cases).

An articulated opinion from a state court has natural pertinence to resolution of disputed questions of both law and fact on *habeas corpus* review. But some state-court decisions reach a conclusion without such articulation. What then? The Fifth Circuit holds, "When faced with a silent or ambiguous state habeas decision, the federal court should 'look through' to the last clear state decision on the matter." *Jackson v Johnson*, 194 F3d 641, 651 (5th Cir 1999), quoting *Lott v Hargett*, 80 F3d 161, 164 (5th Cir 1996). This is because a presumption exists that later, unexplained orders rejecting a federal claim are decided on the same basis as earlier, reasoned orders resting upon the same ground. *Ylst v Nunnemaker*, 501 US 797, 803 (1991). This also accords with decisional practice of the Texas criminal courts. The Texas Court of Criminal Appeals holds that a statement of *denial* of a state application for a writ of *habeas corpus* without written order signifies an adjudication that the court below reached the correct ruling on the merits (as compared to a statement of *dismissal*, which means only that the claim was declined on grounds other than the merits). *Ex parte Torres*, 943 SW2d 469, 472 (Tex Crim App 1997, *en banc*); see also *Singleton v Johnson*, 178 F3d 381, 384 (5th Cir 1999).

Even so, the state court's decision will at times be unaccompanied by explanation, with no level of review having issued a reasoned opinion. The Supreme Court holds in such situations that "the habeas petitioner's

17

burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 US at 98; see *Salts v Epps*, 676 F3d 468, 480 n 46 (5th Cir 2012) (applying *Harrington*).

### 3. Denial of counsel during police interrogation (Ground 1)

Fletcher states that on December 12, 2012, he was arrested for allegedly trespassing on the property on an unenclosed railyard. He alleges that (i) he wasn't *Mirandized* or warned under Article 38.22 of the Texas Code of Criminal Procedure before being interrogated by numerous law enforcement officers; (ii) he requested counsel on several occasions after being arrested and before reluctantly agreeing to speak with police; (iii) he was questioned off the record and without warnings for over thirty to forty-five minutes prior to police activating a recording device; (iv) immediately upon being *Mirandized*, he requested to contact and consult counsel by telephone; (v) the interrogating officer ignored Fletcher's request to contact counsel by phone and instead kept the conversation going in a calculated effort to overcome Fletcher's request for counsel; and (vi) Fletcher subsequently gave a recorded statement to the interrogating officer. Dkt 1 at 12–13.

Fletcher asserts that the appellate court has omitted and disregarded material portions of the interrogation colloquy from its record review and analysis and has improperly quoted out of context the portions of the interview it relied on in reaching its conclusions. He says that the omitted and disregarded material portions, together with the rest of the interrogation colloquy, conclusively demonstrate that Fletcher was tricked and cajoled into a waiver and "did not voluntarily waive his privilege." Dkt 58 at 22.

Fletcher filed a motion to suppress at trial, seeking to suppress his statements to police. Dkt 25-3 at 73; Dkt 25-8 at 4. He provided an audio recording of his statement to the police. Dkt 57 The trial court reviewed the statement and denied the motion. Dkt 25-8 at 10.

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v Arizona*, 384 US 436, 444 (1966). A person in custody that is subjected to interrogation must "be informed in clear and unequivocal terms that he has the right to remain silent," warned "that anything said can and will be used against the individual in court," and advised that "he has the right to consult with a lawyer and to have the lawyer with him during interrogation" and that "if he is indigent a lawyer will be appointed to represent him." Id at 474–75.

These four warnings must be given during the custodial interrogation of a suspect for his statement to be admissible. *Dickerson v US*, 530 US 428, 436 (2000). "The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Duckworth v Eagan*, 492 US 195, 203 (1989), quoting *California v Prysock*, 453 US 355, 361 (1981). A valid waiver is one that is voluntary—meaning it is the product of a free and deliberate choice rather than intimidation, coercion, or deception—and that is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *US v Cardenas*, 410 F3d 287, 293 (5th Cir 2005).

A defendant has a constitutional right to object to the use of a confession and to have a fair hearing and a reliable determination on the issue of voluntariness. *Jackson v Denno*, 378 US 368, 377 (1964). "When a defendant challenges the voluntariness of a confession, the government must prove its voluntariness by a preponderance of the evidence in order for the confession to be admissible as substantive evidence at the defendant's criminal trial." *United States v Bell*, 367 F3d 452, 461 (5th Cir 2004) (cleaned up).

The standard for determining whether a suspect invokes his right to remain silent is identical to the

19

standard for determining whether a suspect invokes his right to counsel. See *Berghuis v Thompkins*, 560 US 370, 381–82 (2010). Thus, a suspect must invoke his right to remain silent "unambiguously." *Davis v United States*, 512 US 452, 459 (1994).

Here, there is no unambiguous invocation of the right to remain silent. Fletcher's statements could reasonably have been interpreted as a confession. And, importantly, Fletcher continued answering questions without pause; no further mention was made of his supposed desire to have counsel present. The Court finds that law enforcement officers weren't obligated to cease questioning Fletcher following the statements at issue. See id at 461–62 (officers "have no obligation to stop questioning" if it isn't an unambiguous or unequivocal request"). Nor were the interrogating officers obligated to ask questions to clarify whether Fletcher wanted to invoke his *Miranda* rights. *Berghuis*, 560 US at 381–82, citing *Davis*, 512 US at 461–62.

The First Court of Appeals rejected this ground, stating:

> In his first point of error, appellant contends that the trial court's denying his motion to suppress was erroneous because police disregarded his invocation of his right to have a lawyer present during their taped custodial interrogation of him. Moreover, he insists that the trial court's error was not harmless, as no eyewitness placed him at the scene of the robbery, and the circumstantial evidence against him was weak.

> The State responds that the trial court's ruling was correct because appellant knowingly waived the right to have an attorney present. Our review of the recorded interview supports the State's assertion.

> At the beginning of appellant's taped interview, appellant stated that he knew his *Miranda* rights. The officer nonetheless explained

20

each *Miranda* right—including the right to have a lawyer present during questioning, the right to terminate the interview at any time, and the right to have a lawyer appointed if appellant could not afford to hire one. The officer also stopped after articulating each right to verify that appellant fully understood.

Appellant asked "would it be cool" if they got a lawyer on the phone. The officer explained that would not work, as there would be no way to verify that the person on the phone was a lawyer, and explained again that if appellant wanted to speak to a lawyer or have a lawyer present for any questioning, the interview would stop right then. The officer reminded appellant that the decision was up to him. Appellant then asked what he would get out of participating in an interview, and the officer explained that it was appellant's opportunity to tell his side of what happened.

The conversation was interrupted by a phone call that came in for the officer. When he returned, the following colloquy occurred:

Q. Do you want a lawyer or do you want to talk? It's up to you.

A. I want to talk to you right now.

Q. Do you want a lawyer?

A. No, I don't want my attorney here.

Q. You are waiving your right to have a lawyer?

A. Yeah, I want to talk.

In *Reed*, we held that a defendant asking whether he could get a lawyer if he wanted one was not a clear invocation of his right to have counsel present during questioning. 227 S.W.3d at 115. In holding that the trial court did not abuse its discretion in denying the defendant's motion to suppress his statement in that case, we explained our obligation to look at the totality of the

21

circumstances in assessing if a waiver is voluntary and unequivocal:

Once an accused has invoked his right to counsel, all interrogation by the police must stop until counsel is provided or until the accused himself initiates contact with police. *Dinkins*, 894 S.W.2d at 350 (citing *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S. Ct. 486, 491, 112 L.Ed.2d 489 (1990)). When an accused's invocation is unclear, ambiguous, or equivocal, the interrogating officers are not required to automatically stop the interview. *Lucas*, 791 S.W.2d at 46. They may continue questioning the accused, but only to ascertain whether he wishes to speak to an attorney or continue the questioning without the assistance of counsel. *Id.* Police may not use such clarification as a guise to encourage, coerce, or intimidate the accused to make a statement. *Jamail v. State*, 787 S.W.2d 372, 377 (Tex. Crim. App. 1990).

In reviewing an alleged invocation of the right to counsel, a reviewing court must look at the totality of the circumstances surrounding the interrogation and alleged invocation to determine whether an accused's statement can be construed as an actual invocation of the right. *Dinkins*, 894 S.W.2d at 351. The inquiry is an objective one: whether a reasonable officer, under similar circumstances, would have understood the statement to be a request for an attorney or merely one that might be invoking the right to counsel. *Id.*

When the right to counsel has been invoked, it may be later waived, either expressly or through the actions of the accused. *Lucas*, 791 S.W.2d at 46. Such a waiver must be (1) knowing, intelligent, and voluntary and (2) the product of contact initiated by the accused. *Lucas*, 791 S.W.2d at 46 (citing

22

*Smith v. Illinois*, 469 U.S. 91, 95, 105 S. Ct. 490, 492, 83 L.Ed.2d 488 (1984)).

*Id.* at 115–16. Here, the closest appellant came to invoking his right to a lawyer was asking if it would "be cool" if they got a lawyer on the phone to listen to the interview. This was not a clear, unequivocal invocation of the right to have an attorney present. Thus, consistent with our instructions in *Reed*, the officer continued the interview, but confined his questions to ascertaining "whether he wishe[d] to speak to an attorney or continue the questioning without the assistance of counsel." *Id.* at 115. At that point, appellant expressly waived his right to have counsel present.

Finally, appellant contends that introduction of his statement violated article 38.22 of the Texas Code of Criminal Procedure, which governs the admissibility of a defendant's recorded statements. Although he does not articulate how this article was allegedly violated, we need not attempt to glean the basis for this argument, as he did not object to admission of the statement at trial. In fact, his attorney stated he had no objection to its admission, subject to agreed-upon redactions. *See, e.g., Rosales v. State*, 335 S.W.3d 284, 287–88 (Tex. App.–San Antonio 2010, pet. ref'd) ("In order to preserve error for review, an objection that the statement was taken in violation of section 38.22 must be specifically made .... Here, because Rosales affirmatively stated he did not have an objection to the entry of the oral statement, we conclude that he has waived his right to complain.").

Because we conclude that the trial court did not abuse its discretion in denying appellant's motion to suppress, we overrule appellant's first point of error.

23

*Fletcher v State*, No. 01–15–00966–CR, 2016 WL 6962307, *6–7 (Tex App Houston [1st Dist] Nov 29, 2016, pet refd) (unpublished).

Respondent correctly argues that Fletcher's comments to his interviewing law enforcement officers quoted above—would it "be cool" if they got a lawyer on the phone—don't constitute an unequivocal assertion of his right to counsel. Fletcher's purported invocation of his right to counsel was just as ambiguous and equivocal as those that the Fifth Circuit has held did not mandate termination of a custodial interrogation. See, for example, *United States v Carrillo*, 660 F3d 914, 923 (5th Cir 2011) (considering entire context and finding insufficient invocation when defendant said, "I just man, I'm not gonna lie to you I wish I had a lawyer right here knowing that you know it's gonna I mean I'm gonna work with y'all I'm telling you I'm gonna tell you everything"); *United States v Montes*, 602 F3d 381, 385 (5th Cir 2010) ("Maybe I should get an attorney" or "Do I need an attorney" insufficiently unambiguous to invoke right to counsel); *United States v Posada-Rios*, 158 F3d 832, 867 (5th Cir 1998) (subject's statement that she "might have to get a lawyer then, huh?" insufficiently unambiguous to invoke right to counsel).

Under these circumstances, Fletcher's interrogating law enforcement officers were not required to terminate Fletcher's post-arrest interview when Fletcher mentioned that he felt like he wanted a lawyer on the telephone. There was nothing inherently coercive in his interrogator's follow-up questions, after the first of which Fletcher stated, "I want to talk to you right now." The law enforcement officers didn't use their clarifying questions as a guise to encourage, coerce, or intimidate Fletcher to make a statement. Fletcher has thus failed to allege any facts showing that his Fifth or Sixth Amendment rights were violated by law enforcement officers during his post-*Miranda*-warnings interrogation.

Fletcher's Fifth Amendment rights were not violated during the interrogation. This court will 'look through' to

24

the last clear state decision on the matter. *Jackson v Johnson*, 194 F3d 641, 651 (5th Cir 1999), quoting *Lott v Hargett*, 80 F3d 161, 164 (5th Cir 1996). The court presumes that later, unexplained orders rejecting a federal claim are decided on the same basis as earlier, reasoned orders resting upon the same ground. *Ylst v Nunnemaker*, 501 US 797, 803 (1991). He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 1 will be denied.

### 4.   Sufficiency of the evidence (Ground 2)

Fletcher asserts that the evidence was insufficient to support his conviction. He explains that the evidence was insufficient because (i) eyewitnesses and police witnesses had no knowledge of the offense or any related events; (ii) all of the State's eyewitnesses testified that they could not identify any of the four to six suspects that committed the offense; (iii) the eyewitnesses all gave general descriptions of the suspects as being big, very big, tall, and large individuals who were all dressed alike in dark clothing; (iv) none of the State's eyewitnesses identified Fletcher, prior to trial or during trial, as being one of the suspects who committed the offense or as matching the physical description of any of the suspects; (v) none of the State's eyewitnesses testified that the clothing evidence introduced by the State matched that of any of the suspects who committed the offense; (vi) one of the State's eyewitnesses positively identified the vehicle used by the suspects as being a Dodge Nitro 6, and never said that the Jeep Liberty introduced by the State was in fact the vehicle used in the offense; (vii) the State never offered any testimony or evidence identifying Fletcher as matching the physical description of any of the suspects; (viii) the State never offered any testimony or evidence that the cash allegedly found in Fletcher's possession was the cash taken from the victim; (ix) the State never offered any proof that the Jeep Liberty was the actual vehicle used in the robbery;

25

(x) the State failed to prove that Fletcher had any knowledge of, or control over, any of the stolen items found in the rear of the Jeep; and (xi) the State failed to prove that Fletcher had any control over, or possession of, the Jeep itself. He also claims that a strained reading of the trial record is the only way the state appellate court could have concluded that his clothing and size matched the victim's description of the suspects. Dkt 58 at 29.

Fletcher's claim that the evidence was legally insufficient lacks merit. In reviewing legal sufficiency, Texas and federal courts view the evidence in the light most favorable to the verdict and ask whether a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v Virginia*, 443 US 307, 319 (1979). The same standard pertains on federal *habeas corpus* to review of the evidentiary sufficiency of a state court conviction. This standard requires only that a reviewing court determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id at 319. In conducting that review, a federal *habeas corpus* court may not substitute its view of the evidence for that of the fact finder but must consider all of the evidence in the light most favorable to the verdict. See *Weeks v Scott*, 55 F3d 1059, 1061 (5th Cir 1995). The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, as long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v Stevenson,* 126 F3d 662, 664 (5th Cir 1997).

To determine whether the evidence is sufficient to support a state criminal conviction, a federal *habeas* court looks to state law for the substantive elements of the relevant criminal offense. *Jackson,* 443 US at 324 n 16; *Dupuy v Cain*, 201 F3d 582, 589 (5th Cir 2000), cert denied, 121 S Ct 885 (2001). Either direct or circumstantial evidence can contribute to the sufficiency of the evidence

underlying the conviction. *Schrader v Whitley,* 904 F2d 282, 287 (5th Cir), cert denied, 498 US 903 (1990). A federal court may not substitute its own judgment regarding the credibility of witnesses for that of the state courts. *Marler v Blackburn,* 777 F2d 1007, 1012 (5th Cir 1985). All credibility choices must be resolved in favor of the jury's verdict. *United States v Nguyen,* 28 F3d 477, 480 (5th Cir 1994). Credibility issues are for the finder of fact and do not undermine the sufficiency of the evidence. *United States v Morgan,* 117 F3d 849, 854 n 2 (5th Cir), cert denied, 118 S Ct 641 (1997). "Where a state appellate court has conducted a thoughtful review of the evidence, moreover, its determination is entitled to great deference." *Callins v Collins*, 998 F2d 269, 276 (5th Cir 1993) (citation omitted).

The indictment alleged that:

> The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, SAM AUTRY FLETCHER, hereafter styled the Defendant, heretofore on or about DECEMBER 1, 2012, did then and there unlawfully, while in the course of committing theft of property owned by YANETH VILLANUEVA, and with intent to obtain and maintain control of the property, INTENTIONALLY THREATEN AND PLACE YANETH VILLANUEVA IN FEAR OF IMMINENT BODILY INJURY AND DEATH, and the Defendant did then and there use and exhibit a deadly weapon, namely, A FIREARM.

> Before the commission of the offense alleged above, on APRIL 16, 1996, in Cause Number 9416659 in the 339TH District Court of HARRIS County, Texas, the Defendant was convicted of the felony offense of AGGRAVATED ASSAULT-PEACE OFFICER.

> AGAINST THE PEACE AND DIGNITY OF THE STATE.

Dkt 25-3 at 15.

27

Fletcher raised this issue on appeal. The First Court of Appeals rejected the claim, stating:

### SUFFICIENCY OF THE EVIDENCE

#### A. Applicable Law and Standard of Review

The jury was charged with the definition of aggravated robbery under section 29.03(a)(2) of the Texas Penal Code, providing that a "person commits an offense if he commits robbery .... and he uses or exhibits a deadly weapon," and on the law of the parties under section 7.02(a)(2) of the Texas Penal Code, providing that a "person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."

When reviewing whether there is legally sufficient evidence to support a criminal conviction, the standard of review we apply is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original). This standard tasks the factfinder with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts. *Id.* On appeal, reviewing courts "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *See Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015) (citing

*Hooper v. State*, 214 S.W.3d 9, 12 (Tex. Crim. App. 2007)). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Guevara*, 152 S.W.3d at 49.

B. Analysis

Appellant argues that there is no evidence that he himself was present at the Villanuevas' home, as no one at the scene positively identified him. He also notes that his fingerprints were not found on the items in the Jeep. He contends that no rational trier of fact could have found him guilty of aggravated robbery as a participant or a co-conspirator because, at most, the evidence demonstrated that he admitted to driving the get-away vehicle.

Appellant's argument does not take into account all of the evidence—direct and circumstantial—before the jury. Appellant does not dispute that an aggravated robbery took place at the Villanuevas' house, or that the Jeep was the get-away car that contained all the instrumentalities, weapons, and spoils of that robbery.

Appellant was dressed in black and is similar in size and description to the descriptions given by the robbery victims. Appellant changed his story, first claiming he was not involved at all, then claiming he was hired by a drug dealer to move a vehicle from one location to another for $350. Then he changed his story completely, claiming that he was picked up by men he did not know, waited a significant amount of time for a white Jeep to show up, got into the Jeep and ran from the police.

Appellant's cell phone was found in the Jeep, and he had thousands of dollars cash in his possession bundled in the same manner as the money stolen from the Villanuevas' home. He

29

offered varying accounts of how his cell phone ended up in the Jeep (first that he dropped it reaching into the vehicle, and then that he dropped it because he was riding in or driving the Jeep) and how he ended up with $5,900 in cash bundles (first that he stole it from the Jeep after spotting it through the window, and then that he stole it from the floorboard of the vehicle because one of the robbers dropped it there and the robbers were not paying attention to it).

Given the Jeep's undeniable association with the robbery, the victims' descriptions of the perpetrators, and appellant's ever-changing story, a rational jury could have determined that appellant participated in the robbery or—at a minimum—intended to aid those who did. A rational jury could have disbelieved that he just happened to be picked up on a side street by people he did not know, waited until robbers arrived in the white Jeep, and then hopped into the Jeep crowded with people and loaded with police garb, firearms, electronics and money without any prior knowledge of, or plan to assist with, the robbery. The jury could also plausibly have believed that the $5,900 in appellant's possession was appellant's cut of the robbery proceeds rather than money he managed to steal undetected off the floor of a vehicle crowded with people while in a police chase. Because a rational jury could have found appellant guilty beyond a reasonable doubt, appellant has not demonstrated that there is insufficient evidence to support his conviction.

We overrule appellant's fourth point of error.

*Fletcher v State*, No. 01–15–00966–CR, 2016 WL 6962307, *15–16 (Tex App Houston [1st Dist] Nov 29, 2016, pet refd) (unpublished).

The First Court of Appeals applied the *Jackson* standard to the facts of this case. It concluded that a

30

reasonable fact finder could have found Fletcher guilty beyond a reasonable doubt. He's failed to rebut the presumed correctness of the state court's finding. Because the record provides no evidence that the state court was unreasonable in rejecting Fletcher's insufficient evidence claim, Fletcher isn't entitled to *habeas* relief on this ground. This Court will look through to the last clear state decision on the matter. The Court presumes that later, unexplained orders rejecting a federal claim are decided on the same basis as earlier, reasoned orders resting upon the same ground. *Ylst v Nunnemaker*, 501 US 797, 803 (1991). He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 2 will be denied.

### 5.   Oral dismissal agreement (Ground 3)

Fletcher asserts that (i) on March 6, 2013, he and Williams met with Assistant District Attorney Nathan Hennigan in the 178th District Court's conference room; (ii) Fletcher and the prosecutor entered an oral agreement, and Williams approved it; (iii) parties agreed that Fletcher would provide substantial assistance to the State's police investigators (namely Harris County Sheriff's Deputy Detective Christopher Mullins), and the State, after being notified by Detective Mullins of Fletcher's satisfactory compliance, would move to have the charges against Fletcher dismissed; (iv) Fletcher labored under the dismissal agreement for two years, from February 2013 through February 2015; (vi) on September 15, 2014, the then Chief Prosecutor for the 178th District Court of Harris County refused to honor the oral dismissal agreement made between the Assistant District Attorney Hennigan and Fletcher; and (vii) Fletcher's case was transferred to the 183rd District Court of Harris County, where he was tried and convicted for the charged offense. Dkt 1 at 15–16.

Williams testified as follows:

1. There was never an oral agreement to dismiss the criminal charges against the applicant by any

31

representative of the Harris County District Attorneys Office.

2. As a veteran criminal defense attorney, had anyone from the Harris County District Attorneys Office made an oral offer for a dismissal, I would have secured it in writing. No such agreement was ever made.

3. Because there was never any agreement for a dismissal, it was never memorialized verbally or in writing.

4. The Harris County District Attorney never made any offer to dismiss the case. Mr. Fletcher met with an Assistant District Attorney and law enforcement in an effort to assist them in the apprehension of persons who law enforcement believed were co-defendants of his. He actually went out with law enforcement personnel in order to help identify co-defendants who he did not know. Mr. Fletcher made a good faith effort to find these persons, however, law enforcement never apprehended or charged anyone else.

Dkt 25-42 at 10.

The state *habeas* court found that:

9. In the Applicant's second ground for relief he argues he received the ineffective assistance of counsel due to trial counsel allegedly failing to document and draw the court's attention to a dismissal agreement between the applicant and the State. *Applicant's Writ at 8-9.*

10. The Court finds, based on the credible affidavit of trial counsel, that no oral or written dismissal agreement was made by the State. *Affidavit of Cornell Williams.*

11. The Court finds, based on the credible affidavit of trial counsel, that had a dismissal agreement been made Counsel would have secured the agreement in writing. *Id.*

32

12. The Court finds, based on the credible affidavit of trial counsel, that the applicant assisted the Harris County District Attorney and Law enforcement in attempting to identify unknown co-actors however law enforcement did not apprehend or charge anyone else. *Id*.

Dkt 25-42 at 5.

Fletcher complains that the state *habeas* judge found Williams's affidavit to be credible, reliable, and persuasive, but never even simply states why Williams's affidavit is more persuasive than Fletcher's affidavits and supporting evidence. The state *habeas* judge was not the judge that presided over any of Fletcher's trial proceedings and had no direct, historical knowledge of any of the facts or events that occurred in this case prior to the state *habeas* proceeding. Also, there is absolutely nothing in the state *habeas* judge's findings and conclusions that indicates that the state *habeas* judge weighed Fletcher's credibility or the reliability of his supporting affidavits and exhibits. Dkt 58 at 42.

The record shows that Judge Wayne Mallia conducted Fletcher's trial. Dkt 25-7 at 1. The record further shows that Judge Chuck Silverman entered the findings of fact on state *habeas* review. Dkt 25-42 at 8.

Fletcher argues there should be no presumption of correctness or deference given to the state court's findings because the state *habeas* judge did not conduct a hearing. A state court's factual determinations are entitled to a presumption of correctness under § 2254(e)(1), regardless of whether the state *habeas* court held a live evidentiary hearing, versus a paper hearing, or whether the state *habeas* judge was the same judge who presided at trial. See *Morrow v Dretke*, 367 F3d 309, 315 (5th Cir 2004); *Valdez v Cockrell*, 274 F3d 941, 951 (5th Cir 2001); *Carter v Johnson*, 131 F3d 452, 460 n 13 (5th Cir 1997); *Hudson v Quarterman*, 273 F Appx 331, 2008 WL 1708998 (5th Cir 2008); *Bass v Dretke*, 82 F Appx 351, 2003 WL 22697282, at *3 (5th Cir 2003). The AEDPA's deferential scheme is

33

mandatory and applies to all claims adjudicated on the merits in state court. *Valdez v Cockrell*, 274 F3d 941, 951 (5th Cir 2001).

The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law. As such, there was no agreement, and Fletcher's rights couldn't have been violated by its breach.

Ground 3 will be denied.

6.   Ineffective assistance of trial counsel (Grounds 4–11, 13–24, 29, 30 & 32)

Fletcher asserts that his trial counsel, Cornel Williams, was ineffective in a number of ways.

Fletcher must demonstrate both *deficient performance* and ensuing *prejudice* to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984); see also *Charles v Stephens*, 736 F3d 380, 388 (5th Cir 2013).

To establish *deficiency*, the petitioner must show that the performance by trial counsel fell below an objective standard of reasonableness based on "prevailing norms of practice." *Loden v McCarty*, 778 F3d 484, 494 (5th Cir 2016); see also *Kitchens v Johnson*, 190 F3d 698, 701 (5th Cir 1999). In that regard, courts should be "highly deferential" to counsel. *Strickland*, 466 US at 689. This means that "counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment." Id at 690. This is particularly true as to "strategic choices made after thorough investigation of law and facts relevant to plausible options," which are "virtually unchallengeable." Id at 690–91; see also *United States v Jones*, 287 F3d 325, 331 (5th Cir), cert denied, 537 US 1018 (2002). "*Strickland* does not require deference to those decisions of counsel that, viewed in light of the facts

known at the time of the purported decision, do not serve any conceivable strategic purpose." *Moore v Johnson*, 194 F3d 586, 615 (5th Cir 1999). But beyond this, the Fifth Circuit has described the deficient-performance standard as requiring counsel to have "blundered through trial, attempted to put on an unsupported defense, abandoned a trial tactic, failed to pursue a reasonable alternative course, or surrendered his client." *Jones*, 287 F3d at 331.

To establish *prejudice*, the petitioner must show a reasonable probability that—absent the deficient performance—the outcome of the proceedings would have been different. *Reed v Stephens*, 739 F3d 753, 773 (5th Cir 2014), quoting *Strickland*, 466 US at 687. In this context, a *reasonable probability* is one that is sufficient to undermine confidence in the outcome of the proceedings. *Strickland*, 466 US at 694.

The state *habeas* court found:

> 21. The Court finds that in all things, the applicant fails to show trial counsel's conduct was objectively unreasonable.

> 22. The Court finds that in all things, the applicant fails to show that trial counsel acted deficiently.

> 23. The Court finds that in all things, the applicant fails to demonstrate that his conviction was improperly obtained or that he is being improperly confined.

Dkt 25-42 at 6.

The state *habeas* court concluded:

> To the extent the applicant argues he was denied the effective assistance of counsel in each of his grounds for relief, he fails to prove any deficiency on the part of trial counsel worthy of habeas relief, or to prove any resultant harm. Accordingly, the applicant fails to meet his burden with regard to either prong of Strickland, and the applicant's grounds for relief should be denied. *Strickland v. Washington*, 466 U.S. 668, 686 (1984)

35

(applicant must show counsel was deficient and that deficiency caused harm in order to warrant habeas relief).

In all things, the applicant fails to demonstrate that his conviction was improperly obtained or that he is being improperly confined.

Dkt 25-42 at 7.

a. The oral dismissal agreement (Ground 4)

Fletcher argues that Williams rendered ineffective assistance by failing to notify "the 178th or 183rd District Courts" of the State's breach of the oral dismissal agreement. Dkt 1 at 16.

As discussed above in Section 5, there never was an agreement between Fletcher and representatives of the Harris County District Attorney's Office. Thus, Williams couldn't have been ineffective for failing to enforce, or failing to notify the courts of, the nonexistent agreement. The state *habeas* court found that:

9. In the Applicant's second ground for relief he argues he received the ineffective assistance of counsel due to trial counsel allegedly failing to document and draw the court's attention to a dismissal agreement between the applicant and the State. *Applicant's Writ at 8-9.*

10. The Court finds, based on the credible affidavit of trial counsel, that no oral or written dismissal agreement was made by the State. *Affidavit of Cornell Williams.*

Dkt 25-42 at 5.

Fletcher hasn't shown deficient performance and ensuing prejudice to establish ineffective assistance by his trial counsel. See *Strickland v Washington,* 466 US 668 (1984). The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to,

36

or involved an unreasonable application of, clearly established federal law.

Ground 4 will be denied.

### b. Failing to file motions (Grounds 5, 7, 15, 21, & 24)

Fletcher asserts that Williams rendered ineffective assistance by failing to advance the following motions: motion for speedy trial (ground 5); motion for probable cause hearing (ground 7); writ of attachment or continuance (ground 15); motion for mistrial (ground 21); and motion for a new trial (ground 24). Dkt 1 at 16–17, 18–19, 30–31, 37–38, 39–40.

#### i. Speedy trial (Ground 5)

Fletcher maintains that Williams should have moved for a speedy trial because he was tried "thirty-four months after being arrested and charged." Dkt 1 at 17.

The Sixth Amendment to the United States Constitution grants criminally charged defendants the right to a speedy trial. This serves at least three purposes: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker v Wingo*, 407 US 514, 532 (1972). When determining whether a defendant's Sixth Amendment to a speedy trial has been violated, courts consider four factors, being (i) the length of delay, (ii) the reason for delay, (iii) the defendant's assertion of his right, and (iv) prejudice to the defendant. Id at 530.

The first factor, length of delay, "functions as a triggering mechanism." When there is at least one year between accusation and trial, a court must examine the other three factors. *Barker*, 407 US at 530; see also *United States v Duran-Gomez*, 984 F3d 366, 374 (5th Cir 2020).

The second factor concerns why and how a delay occurred, including which parties bear responsibility for the delay. See *United States v Peeples*, 811 F2d 849, 851 (5th Cir 1987). Under the second factor, courts evaluate

which party is more to blame for the delay. *Vermont v Brillon*, 556 US 81, 90 (2009). Unexplained or negligent delays weigh against the government, although not heavily. *Goodrum v Quarterman*, 547 F3d 249, 258 (5th Cir 2008). On the other hand, intentional delay weighs heavily against the government because "it is improper for the prosecution intentionally to delay 'to gain some tactical advantage over [defendants].'" *Barker*, 407 US at 531 n 32, quoting *United States v Marion*, 404 US 307, 325 (1971).

The third factor requires a court to determine if "[t]he defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 US at 531–32.

Finally, in cases with a delay shorter than five years, the fourth factor, prejudice, requires examination of whether the defendant has suffered "actual prejudice." *United States v Frye*, 372 F3d 729, 737, 739 (5th Cir 2004). "Actual prejudice is assessed in light of the three following interests of the defendant: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired." *United States v Harris*, 566 F3d 422, 433 (5th Cir 2009) (internal quotations omitted).

Fletcher was arrested on December 1, 2012. Dkt 25-3 at 8. He was indicted on March 1, 2013. Dkt 25-3 at 15. His trial began on October 14, 2015. Dkt 25-8 at 1.

The docket sheet shows that between December 3, 2012, and July 31, 2015, there were a total of thirty resets. Twenty-five of those were upon defense request. Dkt 25-4 at 174–76.

Fletcher argues that (i) Williams should have moved for a speedy trial; (ii) had such motion been filed, the trial court would have set the case for trial sooner; and (iii) the numerous defense requests to reset the trial date imply that Williams wasn't ready for trial.

Fletcher hasn't shown that he was subjected to oppressive pretrial incarceration, that he experienced anxiety and concern, and that his defense was impaired. The record shows that he was released on bond on December 3, 2012. Dkt 25-3 at 10. His bond was revoked on February 18, 2015. Id at 37. He was then released on bond again on April 6, 2015. Id at 43. He did not suffer from oppressive pretrial incarceration.

Fletcher hasn't shown deficient performance and ensuing prejudice to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984). The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 5 will be denied.

### ii.   Probable cause hearing (Ground 7)

Fletcher complains that Williams rendered ineffective assistance by failing to move for a probable cause hearing. Dkt 1 at 18–19. He argues that Williams knew the following facts that showed law enforcement lacked probable cause to arrest Fletcher: (i) Fletcher had entered onto the property of a non-enclosed railyard; (ii) Fletcher had spoken to an employee of the railyard, asked for directions from the employee, was given permission to stay on a particular service road inside of the railyard, and was never told that he was trespassing or had to leave the railyard; (iii) police were called to the railyard in response to a trespasser; and (iv) Fletcher was taken into custody by K-9 officers that were dispatched to the railyard by unknown officers. Dkt 1 at 18–19.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." US Const amend IV. "To remain within the bounds of the Fourth Amendment, a warrantless arrest must be

39

supported by probable cause." *Sam v Richard*, 887 F3d 710, 715 (5th Cir 2018), citing *Gerstein v Pugh*, 420 US 103, 111 (1975). "'Probable cause exists when all of the facts known by a police officer 'are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense.'" Ibid, quoting *State v Kleinert*, 855 F3d 305, 316 (5th Cir 2017)). "The test is objective, not subjective," meaning that an officer's "'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'" Ibid, quoting *Devenpeck v Alford*, 543 US 146, 153 (2004); see also *Whren v United States*, 517 US 806, 813 (1996), quoting *Scott v United States*, 436 US 128, 138 (1978) ("'[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'"); *Lopez-Moreno*, 420 F3d at 432 (citation omitted) ("[A]n officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment.").

The Supreme Court held in *Gerstein* that the State "must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest." Id at 125 (footnotes omitted).

Fletcher argues that he was illegally detained without a prompt determination of probable cause, in violation of *Gerstein v Pugh,* 420 US 103 (1975). Not only is Fletcher's claim unsupported by the record, but the Supreme Court clearly stated in *Gerstein* that in requiring a prompt determination of probable cause it did not mean to "retreat from the established rule that illegal arrest or detention does not void a subsequent conviction." Id at 119; accord *Lofton v Whitley,* 905 F2d 885, 889 (5th Cir 1990) ("Even if [the petitioner] were illegally detained, illegal 'detention does not void a subsequent conviction.'"), quoting *Gerstein,*

40

420 US at 119. As such, Fletcher's claim, even if it were supported by the record, wouldn't entitle him to *habeas* relief.

Fletcher hasn't shown deficient performance and ensuing prejudice to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984). The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 7 will be denied.

### iii.   Writ of attachment or continuance (Ground 15)

Fletcher asserts that Williams rendered ineffective assistance by failing to move for a writ of attachment or continuance "in order to secure the attendance and testimony of the State's missing witnesses." According to Fletcher, Detective Mullins, Deputy St. Romain, and "listed S.W.A.T./H.R.U. officers" were "required to be confronted and examined." Dkt 1 at 30–31.

An "attachment" is a writ issued by the clerk of a court, or other authorized person, in a criminal action commanding some peace officer to bring the witness to court to testify for either the State or the defendant. Tex Code Crim Proc Ann art 24.11. Article 24.12 of the Code of Criminal Procedure provides the authority for issuance of writs and sets forth the requirements for how a request for such writ must be made:

> When a witness who resides in the county of the prosecution has been duly served with a subpoena to appear and testify in any criminal action or proceeding fails to so appear, the attorney representing the state or the defendant may request that the court issue an attachment for the witness. The request must be filed with the clerk of

41

> the court and must include an affidavit of
> the attorney representing the state or the
> defendant, as applicable, stating that the
> affiant has good reason to believe, and does
> believe, that the witness is a material
> witness.

Tex Code Crim Proc Ann art 24.12.

If issuance of an attachment is requested for a witness younger than 18 years, the request must likewise include the applicable affidavit from the requesting party described by article 24.12. Tex Code Crim Proc Ann art 24.011(a), (b-1).

St. Romain and Mullins were both on the State's witness list, and St. Romain was subpoenaed three times, as the trial was repeatedly reset. Dkt 25-3 at 53–54, 158; Dkt 25-4 at 193–194, 237, 303. If he did, in fact, ignore the subpoenas, under Texas law it was the State's right to request a writ of attachment, not Fletcher's.

The Fifth Circuit has been clear that "complaints based upon uncalled witnesses" are "not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and that speculations as to what these witnesses would have testified is too uncertain." *Alexander v McCotter*, 775 F2d 595, 602 (5th Cir 1985) (citations omitted); see *United States v Mullins,* 315 F3d 449, 453 (5th Cir 2002) (noting deference given to counsel's trial strategy). To satisfy *Strickland*'s prejudice requirement in such circumstances the petitioner "must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." Ibid (citations omitted).

When the only evidence of a missing witness's testimony is from the defendant, courts view claims of ineffective assistance with great caution. See *Sayre v Anderson,* 238 F3d 631, 635 (5th Cir 2001); *Lockhart v McCotter,* 782 F2d 1275, 1282 (5th Cir 1986). Hypothetical or theoretical testimony will not justify the issuance of a writ. See *Martin v McCotter,* 796 F2d 813, 819 (5th Cir

1986). And failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance. *Sayre,* 238 F3d at 636.

Here, Fletcher hasn't shown that any witnesses would have been able to testify. Nor has he explained either what the content of their testimony would have been or shown that the testimony would have been favorable to his defense. On the whole, his allegations concerning this claim are conclusory and unsupported. See *Harper v Lumpkin*, 19 F4th 771, 778 (5th Cir 2021).

Fletcher hasn't shown deficient performance and ensuing prejudice to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984). The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 15 will be denied.

iv.    Mistrial (Ground 21)

Fletcher complains that Williams failed to move for a mistrial when he learned the jury's verdict wasn't unanimous. He explains that despite the foreman's claims that the decision was unanimous, when the jury was polled Juror 1 said that the decision "was not her own." According to Fletcher, Williams should have objected and moved for a mistrial due to the non-unanimity of the jury and the exposure of a lone dissenter. Dkt 1 at 37–38.

The record doesn't provide support for this claim. Other aspects of earlier interaction with the jury and a particular juror are discussed elsewhere below. But as to this point, after the jury delivered their verdict, they were polled:

> THE COURT: You may be seated. Same thing, ladies and gentlemen of the jury. I'm going to start with Juror No. 1 being the lady in the purple jacket. And then to your left, 2, 3, 4, 5, 6, 7, the Foreperson.

43

And then to your right, 8, 9, 10, 11 and 12. Juror No. 1, is this your verdict?

JUROR: Yes, your Honor.

THE COURT: Juror No. 2,

JUROR: Yes, your Honor.

THE COURT: Juror No. 3,

JUROR: Yes, your Honor.

THE COURT: Juror No. 4,

JUROR: Yes, your Honor.

THE COURT: Juror No. 5,

JUROR: Yes, your Honor.

THE COURT: Juror No. 6,

JUROR: Yes, your Honor.

THE COURT: Juror No. 7,

JUROR: Yes, your Honor.

THE COURT: Juror No. 8,

JUROR: Yes, your Honor.

THE COURT: Juror No. 9,

JUROR: Yes, your Honor.

THE COURT: Juror No. 10, is this your verdict?

JUROR: Yes, your Honor.

THE COURT: Juror No. 11, is this your verdict?

JUROR: Yes, your Honor.

THE COURT: Juror No. 12, is this your verdict?

JUROR: Yes, your Honor.

Dkt 25-11 at 124–126.

The record thus demonstrates that the jury was unanimous. Fletcher hasn't shown deficient performance and ensuing prejudice to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984). The state court's factual determinations are

44

presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 21 will be denied.

### v.   New trial (Ground 24)

Fletcher asserts that Williams rendered ineffective assistance by failing to move for a new trial. Dkt 1 at 39–40.

The record reveals that nine days after the case was resolved, Williams moved to withdraw, and the trial court granted the motion. Dkt 25-3 at 94–96. Fletcher's appellate counsel filed a motion for new trial on November 12, 2015. Dkt 25-3 at 108–110. The court conducted a hearing on December 17, 2015. Dkt 25-13 at 1–47. That motion was denied. Dkt 25-3 at 137–39. Fletcher has failed to demonstrate that he was prejudiced by this alleged deficiency; he has failed to show a reasonable probability that a motion for new trial filed by Williams would have been successful.

Fletcher raised this issue on appeal. That court rejected the claim, stating:

> ### JURY'S VERDICT
>
> Appellant filed a motion for new trial, arguing that the "verdict was decided in a manner that was not a fair expression of the jurors' opinion." In support, the motion stated:
>
> > A juror, when polled, stated that the guilty verdict was not her verdict. The jury resumed deliberation and again returned a guilty verdict. The same juror entered the courtroom and said that the guilty verdict was not her verdict. She said that she had been coerced by the other jurors to agree to a guilty verdict.
>
> Dorothy Hunt (appellant's mother) and Jeremy Engel (a friend of appellant's) wrote letters to the

45

trial court in support of this assertion. Both letters stated that Juror Number 1 came into the courtroom after the jury was dismissed and said that she was bothered by what had happened, she disagreed with the verdict, but she was nonetheless pressured by the jury foreman to convict appellant.

Hunt and Engel were called as witnesses at the Motion for New Trial hearing, but the court sustained objections to their testimony on the basis of hearsay. The court allowed appellant's attorney to make the following bill of review about what Hunt and Engel would have testified to if allowed:

Mr. Engel states that he observed the trial and was deeply disturbed at what he witnessed following the conclusion of the trial after the Court had passed sentence. Mr. Engel would say that when initially polled, the juror, one juror announced that the verdict of guilty was not her verdict. The Court retired the jury again and ordered them to continue deliberating. There was a second polling of the jury at which the juror said that it was her verdict.

After the trial was concluded, Mr. Engel witnessed the very same juror come back into the courtroom and heard her state that she was pressured and intimidated by other jurors and that the jury Foreman had forced her to say that the verdict, her verdict was guilty even though it was not.

Mr. Engel states that the juror, when she made these statements to the Court after the passing of sentence appeared to be distraught, visibly disturbed, agitated. He described her as shook up.

The same juror again approached Mr. Engel outside the courthouse after the conclusion of the trial and restated her feelings that she had been forced, coerced and pressured and that the verdict that was entered was not her verdict.

46

Ms. Hunt is the mother of the Defendant, Sam Fletcher. She was present for the trial. She was present in the courtroom when the jury returned its verdict and when the Court passed sentence.

She states that someone came up to her in the hall outside the courtroom trying to get her attention at least three times saying, "I don't know what to do," that this person who approached Ms. Hunt was known to her to be one of the 12 jurors. This person appeared to be upset, distraught, excited and confused.

She—Ms. Hunt would further state that the juror went into the courtroom and tried to make the Court aware that—and in particular the Judge aware that the verdict that was entered was not her verdict, that she had been pressured or coerced by the other jurors into entering that verdict and that that was not her verdict.

The State called S. Williams, a paralegal for the District Attorney's office, to refute appellant's counsel's recitation of events related to the juror who changed her vote. Williams testified that she was present both times the jury was polled after announcing its verdict, and she confirmed that the juror at issue stated that "guilty" was not her vote the first time polled, but after further deliberations, she confirmed that "guilty" was then her vote.

Williams's version of the interaction between the juror and appellant's mother and friend differed from that represented by appellant's counsel in his bill of review. Williams saw the juror, accompanied by appellant's mother and a person who had sat with appellant's family throughout the trial, come back into the courtroom. At that point, neither the State's attorney nor appellant's attorney were in the courtroom. Williams explained that appellant's mother "was on one side

47

of the juror and the other guy was on the opposite side of the juror. They were both holding her and they were both speaking to her at the same time. It kind of seemed like they were bulldozing over her." Williams described their manner towards the juror as "aggressive." Williams explained that when the bailiff intervened, appellant's family was aggressive towards him as well. The bailiff was able to separate the juror from appellant's family by escorting her out into the hallway.

Bailiff H. Graviel also testified at the hearing that he saw appellant's family trying to forcefully bring the juror into the courtroom. After Graviel separated the juror from appellant's family to prevent things from "escalat[ing] further," Graviel told the juror that if she wanted to speak to the district attorney or appellant's attorney, Graviel would bring them out to the hallway to speak to her. The juror responded that she wanted to leave and did not want to speak to anyone.

The trial court denied appellant's motion for new trial, . . .

. . .

In his third point of error, appellant argues that the trial court should have granted his motion for new trial because the jury's verdict was non-unanimous given that Juror Number 1 told his mother and friend that she had been pressured into agreeing to a "guilty" verdict. Additionally, in his brief here, appellant argues that the court should have removed Juror Number 1 mid-trial after the court questioned her about "appear[ing] sleepy, inattentive, and often had her eyes closed." Appellant acknowledges that (1) Juror Number 1 told the court that, despite her sleepy appearance, she had heard all of the evidence and stated she thought she could come to a fair verdict and (2) rather than seek to have her removed from the jury

at that point, appellant actually objected when the State moved to have her replaced with an alternative juror.

The State responds that "The record before the trial court more than supported the conclusion that the verdict reached was a fair determination of the issue reached by a unanimous jury as indicated by the unanimous agreement of every juror during the polling the trial court obtained before it accepted the verdict." We agree.

The trial court has broad discretion in ruling on a motion for new trial. *McQuarrie*, 380 S.W.3d at 150. And the trial court is the sole judge of credibility of witnesses at a motion for new trial hearing. *Colyer*, 428 S.W.3d at 122. Here, the trial court made specific findings that bailiff Hernandez's testimony was credible, and that Hernandez had to intervene when appellant's supporters became aggressive with Juror Number 1. The court also found, as is supported by the record, that (1) the jury's verdict was unanimous and (2) no evidence was presented of any outside influence upon the jury or that any juror was not qualified to serve. Accordingly, the trial court did not abuse its discretion in denying appellant's motion for new trial.

We overrule appellant's third point of error.

*Fletcher v State*, No 01-15-00966-CR, 2016 WL 6962307 at *12–15 (Tex App [1st Dist] Nov 29, 2016).

Fletcher hasn't shown deficient performance and ensuing prejudice to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984). The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

49

Ground 24 will be denied.

      c.   Failure to investigate (Grounds 6 & 18)

Fletcher maintains in Ground 6 that Williams rendered ineffective assistance by failing to investigate the State's probable cause, his alibi, his "custodial interrogation," his "medical disability," the State's physical evidence, inconsistencies within the discovery packet, and Fletcher's own "work product." Dkt 1 at 17–18. In Ground 18, Fletcher contends that Williams rendered ineffective assistance by failing to "investigate any and all available defenses, prepare any viable defense, or advance any defense." Id at 33–34. He contends that he was precluded from (i) advancing his lack-of-complicity defense through the testimony of a material fact witness (Gabriel Devora) who had direct knowledge of Fletcher's extreme emotional and mental state minutes prior to the police pursuit and knew of Fletcher's desire to remove himself from the company of the alleged suspects; (ii) offering medical records and witnesses' testimony regarding his medical disability and physical handicap; and (iii) advancing his alibi defense through the offering of exculpatory cell-tower location data and call history data, which would have demonstrated that Fletcher was elsewhere, on the phone, while the offense was being committed. Dkt 58 at 52. He also makes assertions about the state *habeas* court's address of such contentions. Dkt 58 at 50.

Courts should be "highly deferential" to counsel. *Strickland*, 466 US at 689. This means that "counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment." Id at 690. This is particularly true as to "strategic choices made after thorough investigation of law and facts relevant to plausible options," which are "virtually unchallengeable." Id at 690–91; see also *United States v Jones*, 287 F3d 325, 331 (5th Cir), cert denied, 537 US 1018 (2002).

"Informed strategic decisions by counsel are given a heavy measure of deference and should not be second

guessed." *United States v Jones,* 287 F3d 325, 331 (5th Cir 2002). Furthermore, Fletcher failed to demonstrate what a more thorough investigation would have revealed and how it would have altered the outcome of his trial. *Gregory v Thaler,* 601 F3d 347, 352 (5th Cir 2016) (petitioner "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial").

In short, Fletcher doesn't explain with any specificity what investigations would have revealed and how it would have altered the outcome of his trial.

Williams testified as follows:

> 6. . . . Fletcher also gave a voluntary video statement which I explained to him would be used to impeach any testimony given by him at trial. The video statement did not support an alibi defense or provide any rational defense theory . . .
>
> . . .
>
> 9. . . . Mr. Fletcher's explanation regarding the offense was that he received an offer from a person known as "Big Escalade" on the south side of Houston to drive a car to the north side of Houston for a fee. He claimed that once he met up with other persons on the north side of Houston to drop the car off, law enforcement officers arrived on the scene. Once Mr. Fletcher saw the officers, he became afraid and decided to run. Mr. Fletcher evaded the officers by running into a wooded area near a train yard off the Hardy Toll Road. After hours of searching for Mr. Fletcher, he claimed he voluntarily surrendered to law enforcement. The evidence presented at trial indicated Mr. Fletcher fit the physical description of one of the persons who robbed a residence of money and assaulted one of the residents of the house. Mr. Fletcher at all times maintained that he was innocent and wanted to cooperate with the authorities to help apprehend

> those responsible for the crime. However, the jury unanimously believed the evidence presented by the State and found Mr. Fletcher guilty of aggravated robbery.

Dkt 25-42 at 10–11.

The state *habeas* court found that Williams's affidavit was "credible, reliable, and persuasive." Dkt 25-42 at 5. It then found:

> 19. The Court finds, based on the credible affidavit of trial counsel, that trial counsel performed a full investigation into the facts and possible legal defenses. Id.

> 20. The Court finds, based on the credible affidavit of trial counsel, that counsel gave the applicant the option to hire a private investigator if he believed one was needed, however both counsel and the applicant determined that no further investigation was needed. Id.

Dkt 25-42 at 6.

Fletcher hasn't shown deficient performance and ensuing prejudice to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984). The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Grounds 6 and 18 will be denied.

> d. Failing to challenge or object to evidence (Grounds 8, 9, & 17)

In Ground 8, Fletcher argues that Williams rendered ineffective assistance by failing to "properly challenge" the State's evidence. Dkt 1 at 19–20. According to Fletcher, both the pants and the shirt that the State planned to introduce into evidence weren't his actual clothing and didn't match what he was wearing when he was arrested.

52

Id at 20. Fletcher asked Williams to challenge the clothing, a "singl[e] glove found on the roadway," and "certain photographic evidence." Ibid.

In Ground 9, Fletcher contends that Williams was ineffective for failing "to connect the inconsistencies and fabrications within, omissions from, and overall misleading nature of the State's evidence." Ibid at 20–23.

In Ground 17, Fletcher alleges that Williams rendered ineffective assistance by failing to challenge the sufficiency of the State's evidence. Id at 32–33.

To the extent that these claims challenge the sufficiency of the evidence, that claim is addressed above in Section 4. Beyond that, Fletcher has failed to show that Williams's performance was deficient for not challenging the sufficiency of the evidence. "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v Collins*, 19 F3d 959, 966 (5th Cir 1994). Fletcher hasn't proved that Williams's actions prejudiced his trial or that but for counsel's errors, the result of the proceeding would be different. See *Strickland*, 466 US at 693–94.

The state court rejected Fletcher's claims of ineffective assistance and found that trial counsel's conduct was neither objectively unreasonable nor deficient. Dkt 25-42 at 6 (nos. 21, 22). The state court's factual determinations are presumed to be correct. He hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Grounds 8, 9, and 17 will be denied.

e.   Failing to impeach the state's witnesses (Ground 10)

Fletcher complains that Williams rendered ineffective assistance by failing to impeach the State's witnesses. Dkt 1 at 23–25.

Fletcher provided the state *habeas* court with an eighty-eight-page affidavit and trial notes that he says demonstrate that Williams was aware (and made aware) of all topics of impeachment. Dkt 25-44 at 90. He argues that (i) he was not in custody during his trial proceedings and had all of the instrumentalities to accurately record his proceedings; (ii) his original trial notes are in full color and very detailed; (iii) his case was highly circumstantial; and Williams put on no defense; and (iv) impeachment of the State's witnesses could have been the difference between finding guilt beyond a reasonable doubt or not. Dkt 58 at 58, 62.

As the Supreme Court has recognized, "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 US at 689. "[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation," but "to ensure that criminal defendants receive a fair trial." Ibid. Thus, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id at 688.

Here, Fletcher argues that a single decision by Williams not to impeach a witness was deficient performance. But Fletcher doesn't support his claim with evidence sufficient to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id at 689 (quotations omitted).

Fletcher hasn't rebutted the state court's findings and conclusions with clear and convincing evidence. Indeed, a thorough review of the trial transcript indicates Williams provided effective cross-examination on several issues, including the credibility of the State's witnesses and the reliability of the evidence. Williams rigorously questioned Yanneth Villanueva and Louis Villanueva about their employment history; why they had nearly $30,000 in the house; their opportunity to identify the perpetrators; and

54

how they knew the perpetrators were Hispanic or African-American. Williams's cross-examination was reasonable and "[s]peculating about the effect of tinkering with the cross-examination questions is exactly the sort of hindsight that *Strickland* warns against." See *Castillo v Stephens*, 640 F Appx 283, 292 (5th Cir 2016) (unpublished), citing *Strickland*, 466 US at 689.

Finally, Fletcher has not shown that Williams's strategic decision not to impeach was unreasonable. The record indicates that Williams chose to focus on impeaching the law enforcement officers' testimony. He also tried to discredit the eyewitnesses' testimony by showing they never positively identified him as the perpetrator.

Williams's cross-examination was anything but deficient. "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v Cockrell*, 343 F3d 746, 752–53 (5th Cir 2003).

Because counsel's decisions regarding cross-examination were strategic and imminently reasonable, they "will not support an ineffective assistance claim." *United States v Bernard*, 762 F3d 467, 472 (5th Cir 2014) (citation omitted). This is particularly true when Fletcher provides nothing but conclusory assertions about counsel's performance. See *United States v Demik*, 489 F3d 644, 646 (5th Cir 2007) ("conclusory allegations are insufficient to raise cognizable claims of ineffective assistance of counsel"). As such, Fletcher hasn't shown Williams's performance was deficient or that the state court's denial of this claim was unreasonable.

Fletcher hasn't shown deficient performance and ensuing prejudice to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984). The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't

55

shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 10 will be denied.

### f.   Failing to challenge the chain of custody of the State's evidence (Ground 11)

Fletcher maintains that Williams rendered ineffective assistance by failing to "properly challenge the chain of custody of the State's evidence, or request an instruction to the jury on the weight of the chain of custody evidence." Dkt 1 at 25–26. Fletcher contends that the State did not maintain its chain of custody over the Jeep and Fletcher's clothing. Ibid.

Texas Rule of Evidence 901 governs the general authentication requirements for the admissibility of evidence and requires the proponent to produce "evidence sufficient to support a finding that the item is what the proponent claims it is." This may be done in a variety of ways, including testimony of a witness with knowledge that the item is what it is claimed to be. Ibid; *Butler v State*, 459 SW3d 595, 601 (Tex Crim App 2015).

However, "[a]ny break in the chain of custody goes to the weight of the evidence, not its admissibility." *United States v Smith*, 481 F3d 259, 265 (5th Cir 2007). There was substantial evidence either indicating or from which it could be inferred that the items were possessed by Fletcher. Thus, a motion to suppress evidence based on the chain of custody in this case would have been futile. Fletcher has failed to show Williams provided ineffective assistance.

Fletcher has failed to show that there was a basis for challenging the chain of custody. Fletcher hasn't shown deficient performance and ensuing prejudice to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984). The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence.

56

He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 11 will be denied.

> g. Failing to object to an alleged non-disclosure of *Brady* material (Ground 13)

Fletcher asserts that Williams rendered ineffective assistance by failing to object to the State's violation of *Brady* and failing to move for a continuance to discover the *Brady* evidence. Dkt 1 at 28–29.

As discussed below in Section 7, Fletcher hasn't shown that the allegedly withheld evidence constituted a violation of *Brady* because he didn't show materiality to his guilt or punishment. Therefore, Williams couldn't have been deficient for failing to object to the non-disclosure or file a continuance in order to review it. Counsel is not required to file frivolous motions or make frivolous objections. *Green v Johnson,* 160 F3d 1029, 1037; *McCoy v Lynaugh,* 874 F2d 954, 963 (5th Cir 1989). It is settled that "failure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness." *Green,* 160 F3d at 1037; accord *McCoy,* 874 F2d at 963.

Fletcher hasn't shown deficient performance and ensuing prejudice to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984). The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 13 will be denied.

> h. Failing to object to the State's alleged tampering with and destruction of evidence (Ground 14)

Fletcher contends that Williams rendered ineffective assistance by failing to object to "the State's intentional

57

tampering with and destruction of (material) evidence." Dkt 1 at 29–30. Fletcher alleges that, when he received his cell phone back from police custody, it was "without any of the stored data, except for [Fletcher's] contact list." Id at 29.

Sgt. Haver, a responding officer to the home invasion robbery, noted the following about the phone in his incident report:

> I observed a cell phone lying in the street, next to the curb where the suspects fled into the woods. I know the phone was not there the day before. Deputy Griffin photographed the phone and I recovered it. I turned the phone on to see if I could find an owner. The[re] was very little information or contacts in the phone. It appeared to be what is commonly referred to as a "burn" phone used in criminal activity.

Dkt 25-47 at 41.

Fletcher hasn't shown that the tampering with or destruction of evidence actually occurred. Therefore, Fletcher hasn't shown that Williams's failure to object to the purported destruction of evidence was deficient, and he hasn't shown how this alleged deficiency prejudiced him.

The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 14 will be denied. denied.

  i. Failing to object to the State's opening argument (Ground 16)

Fletcher contends that Williams rendered ineffective assistance by failing to object to the State's opening argument. Dkt1 at 31–32. He notes that during the State's opening arguments to the jury, the prosecutor (A.D.A. Joshua Phanco) told the jury that (i) it would hear

testimony from Yanneth Villanueva that she could not see the faces of the men that took her into the bathroom because they (the suspects) wore masks; (ii) it would hear testimony from Yanneth Villanueva that the men threatened to rape her in front of her husband; (iii) it would hear testimony from Luis Villanueva that the two male Hispanics (who kidnapped Luis) jumped out of Luis's truck and jumped into a white jeep and took off; (iv) it would see police video footage of the white jeep at the point of passing the police unit of Deputy Constable Mary Haver; and (v) it would see pictures of how the money taken from the complainants was wrapped, and exactly how the money was found in Fletcher's pocket. Dkt 1 at 31. Fletcher argues that Williams failed to object to these as improper opening arguments, failed to point out to the trial court that the State had failed to produce specific evidence promised to the jury during opening arguments, and that the State had thus placed harmful and prejudicial facts into evidence.

Fletcher doesn't describe the grounds of the objection Williams should have raised. He also fails to show that the objection would have been granted if made. Any objection to the prosecutor's opening statement would have been futile.

Fletcher concedes that he's not entitled to *habeas* relief on this claim. Dkt 58 at 72. He asserts that this ground supports his claim of cumulative error. Ibid. The merits of this claim are addressed below.

The trial court instructed the jury:

> I also want to let you know the attorneys may choose to give opening statements in the case. I do want to advise you that what the attorneys say is not, is not evidence in the case. The purpose of the opening statements is to give you a general outline or overview of what they believe the evidence in the case will be, but what they say is not evidence in the case.

Dkt 25-9 at 11–12.

The trial court clearly instructed the jury that attorneys' arguments were not evidence. Juries are presumed to follow the instructions the trial court gives them, and Fletcher supplies no reason to second-guess that presumption here. *United States v Owens*, 683 F3d 93, 99 (5th Cir 2012).

Williams also reminded the jury that what the attorneys said wasn't evidence during his closing argument:

> We've got some 135 exhibits that have been in here. Okay? And the problem with this evidence is that it doesn't really amount to very much at all. And I want to review the testimony as I've seen it, okay, to show you why it doesn't amount to much. Now, remember, what I tell you is not evidence. What Mr. Phanco tells you is not evidence. I'm going to go in order -- well, I'm just going to go over what I believe the testimony of the witnesses were. This is not evidence from me. Okay? If your mind tells you something other than what I'm saying, I'm not trying to mislead you. This is how I remember the evidence. The same with Mr. Phanco. What he's telling you is not evidence. All the evidence has been solicited from this witness stand. You have it all.

Dkt 25-11 at 96. Fletcher can't show that the trial court would have granted Williams's objection to the prosecutor's improper opening argument.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Wellogix, Inc v Accenture, LLP*, 716 F3d 867, 874 (5th Cir 2013) (citation omitted). "Attributing weight to conflicting evidence, and drawing inferences from such evidence, are within the province of the jury and its decision should be given deference if the record contains any competent evidence to support its findings." *Industrias Magromer Cueros y Pieles S.A. v Louisiana Bayou Furs Inc,* 293 F3d 912, 918 (5th Cir

2002), citing *Gibraltar Savings v LDBrinkman Corp*, 860 F2d 1275, 1297 (5th Cir 1988).

Williams's failure to press a frivolous objection didn't constitute ineffective assistance. Fletcher can't sustain his allegation that additional objection from Williams would have been fruitful. See *Johnson v Cockrell,* 306 F3d 249, 255 (5th Cir 2002) (concluding that counsel isn't required to make futile motions or frivolous objections).

Fletcher hasn't shown deficient performance and ensuing prejudice to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984). The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 16 will be denied.

> j. Failing to object to prosecutorial misconduct during closing argument (Ground 20)

Fletcher contends that Williams rendered ineffective assistance by failing to object to several instances of alleged prosecutorial misconduct during closing argument. Fletcher asserts that the prosecutor misstated the law, the facts, and testimony at trial; "dispen[s]ed with the presumption of innocence"; "alluded to an allegiance between the trial court and the State's attorneys"; commented on Fletcher's failure to testify; attacked trial counsel's "character and lawful efforts"; "bolstered and vouched for the credibility of the complainants"; alluded to facts not in evidence; made conscience-of-the-community arguments; argued the absence of evidence that it had excluded by motion *in limine*; alluded to Fletcher's propensity to commit robbery; and "made improper predictions" about Fletcher's reaction to a guilty verdict. Dkt1 at 34–37.

61

Claims of prosecutorial misconduct in a state court prosecution are governed by the clearly established standard set forth in *Darden v Wainwright*, 477 US 168 (1986); see also *Parker v Matthews*, 567 US 37, 45 (2012, *per curiam*). A constitutional violation occurs only where "the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 US at 181, quoting *Donnelly v DeChristoforo*, 416 US 637 (1974). Federal *habeas* relief is rarely granted on the basis of prosecutorial misconduct because "a prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most 'egregious cases.'" *Menzies v Procunier*, 743 F2d 281, 288–89 (5th Cir 1984), quoting *Houston v Estelle*, 569 F2d 372, 382 (5th Cir 1978). A prosecutor's comments will only render a trial unfair where the improper argument was "a crucial, critical, highly significant factor in the jury's determination of guilt." *Whittington v Estelle*, 704 F2d 1418, 1422 (5th Cir 1983).

Prosecutorial misconduct may violate due process by abridging "a specific right conferred by the Bill of Rights," such as the right to remain silent. *Foy v Donnelly*, 959 F2d 1307, 1316, quoting *Rogers v Lynaugh*, 848 F2d 606, 608 (5th Cir 1988). Alternatively, it may violate due process "generally," thus constituting a "generic substantive due process' violation." Ibid. When a petitioner asserts a generic due process violation, courts follow a two-step process. *United States v Duffaut*, 314 F3d 203, 210 (5th Cir 2002). First, the court determines whether the prosecution's conduct was improper. Second, if the conduct was improper, the court determines whether the conduct prejudiced the defendant's substantive rights. Ibid. Prosecutorial misconduct prejudices a defendant's substantive rights if it renders the defendant's trial fundamentally unfair within the meaning of the Fourteenth Amendment. *Darden v Wainwright*, 477 US 168, 181; *Donnelly v DeChristoforo*, 416 US 637, 643.

62

"A trial is fundamentally unfair if there is a reasonable probability that the verdict *might have been different* had the trial been properly conducted." *Foy*, 959 F2d 1307, 1317 (cleaned up, emphasis added); *Barrientes v Johnson*, 221 F3d 741, 753 (5th Cir 2000) (same). Despite the apparent generosity of this standard, when petitioners argue that the prosecutorial misconduct consisted of improper comments or argument, the Fifth Circuit imposes a tougher burden. In those instances, a prosecutor's improper remarks "must either be so persistent and pronounced, or the evidence so insubstantial that, but for the remarks, no conviction would have occurred." *Kirkpatrick v Blackburn*, 777 F2d 272, 281; *Felde v Blackburn*, 795 F2d 400, 403 (5th Cir 1986) (same); *Turner v Johnson*, 106 F3d 1178, 1188 (5th Cir 1997) (same); *Harris v Cockrell*, 313 F3d 238, 245 (5th Cir 2002) (same). "Improper prosecutorial remarks are constitutionally unfair only if they are persistent and pronounced, or if the evidence is so weak that no conviction would have occurred but for the remarks." *Woodfox v Cain*, 609 F3d 774, 806 (5th Cir 2010), citing *Hughes v Quarterman*, 530 F3d 336, 347 (5th Cir 2008); see also *Williams v Davis*, 192 F Supp 3d 732, 751 (SD Tex 2016). A prosecutor's comments "are not considered in isolation, but are evaluated in the context of the entire trial as a whole, including the prosecutor's entire closing argument." *Kirkpatrick*, 777 F2d 272, 281 (citation omitted).

Allegations of prosecutorial misconduct are analyzed in two steps. *Trottie v Stephens*, 720 F3d 231, 253 (5th Cir. 2013) (citation omitted). The first is to evaluate whether the prosecutor made an improper remark. *United States v Fields*, 483 F3d 313, 358 (5th Cir 2007) (citation omitted). If so, the second step is to determine whether the defendant suffered prejudice. Ibid. The latter sets a high bar. "Improper prosecutorial comments constitute reversible error only where the defendant's right to a fair trial is substantially affected." *United States v Ebron*, 683 F3d 105, 140 (5th Cir 2012), quoting *United States v Holmes*, 406 F3d 337, 355–56 (5th Cir 2005). A criminal conviction

63

should not be "lightly overturned on the basis of a prosecutor's comments standing alone," but rather only when "the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." Ibid. Thus, in deciding whether serious doubt infected the verdict, the Court considers three factors: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." Ibid, quoting *United States v Mares*, 402 F3d 511, 515 (5th Cir 2005) (internal quotation marks omitted).

The prosecutor stated during his closing argument:

> What the Defense has been doing during this entire trial is attempting to divert your attention away from the fact that his client, Sam Fletcher, is an aggravated robber that's inside of a home, put a gun to people's heads and say, "Hey, I'm going to kill you." They have done an excellent job of nitpicking this case together so that we actually don't sit there and we're not feeling the fear that these people felt.

> You ever thought you were going to die? Well, they did. And here we are sitting here nitpicking this case and they never actually do it hoping that if they divert your attention enough, if they sit there and say, "You know what? They didn't have DNA." Did we not? You just didn't hear evidence of it. I told you at the beginning, you might not hear evidence you want to hear. Don't assume that we know what happened to it.

> They want to sit here and tell you, why didn't they dump his cell phone? Well, here. Guess what? Who's got the cell phone? He does. And he doesn't need probable cause to dump it and bring you the evidence.

> So, for him to stand up here and say, "You know what? They could have dumped the cell phone." So

64

could they and they could give you the evidence. It's --

MR. WILLIAMS: Objection, your Honor. He knows that we have no burden of proof anywhere. The burden is on him at all time. He's shifting the burden to the Defendant by suggesting that he can present evidence. I think that should be stricken, your Honor.

THE COURT: All right. I will just remind the jury that the burden of proof rests upon the District Attorney's Office throughout the trial.

MR. PHANCO: Darn right. I got to prove beyond a reasonable doubt that he's guilty. And I can do it. But don't let him for one minute divert your attention with evidence that he could have brought to you.

MR. WILLIAMS: Again, your Honor, it's the same thing. We don't have to present any evidence. Mr. Phanco is aware of that. And he's attempting to shove the burden of proof to Mr. Fletcher.

THE COURT: It's final argument. I'll just remind you again, ladies and gentlemen, the burden of proof is on the District Attorney's Office.

MR. WILLIAMS: Thank you.

MR. PHANCO: But we'll allow that argument because don't let him divert your attention. They could have bought you that piece of evidence. Don't let him say that we didn't give it to you.

The fact that he's offended by the evidence? I'm offended that you would say that, quite frankly. What's he offended by? The fact that his man is found inside of a white Jeep that was seen pulling away from their house? Ivette's the most credible witness we have. According to the Defense, she's the one who says it's a white SUV leaving the house.

65

And miraculously, when we pull over that white SUV leaving the house that we see on the video, they've got police vests and guns and everything matching up to this crime. And all of a sudden he wants to say, "I wasn't there." And he's offended by that. Why? Because we pull a big black man out of the woods, that's what he said? He was there. It's not like we planted him there. He went there. We didn't tell him to run from the cops. He did.

We didn't ask him to go to the train conductor and say, "Can I pay you money to drive me to 45?" Guess what? He lives on 45 South. Where do you think he was trying to go? You want to know what I'm offended at, is the fact that you were trying to divert the attention away from the fact that your client is guilty of aggravated robbery.

The fact that we're sitting here calling these people drug dealers, make no mistake, this entire trial that's what he's alluding to. These four people who have been cooperative the entire time, who were sitting here in this courtroom to be held responsible are somehow drug dealers.

If you heard that there was drugs in the house, don't you think you would have heard that? If there was any other evidence, the fact that they're into the drug cartel, don't you think you would have heard that? Yeah, you would have heard.

And here's a big thing. What does it matter? They still got ripped off. Wait. Maybe what the Defense is arguing that this whole thing is a big setup. Nobody ever got ripped off. Well, here's my question: What's your Defense? The fact that nobody got ripped off? You weren't there. If you weren't there, why do you care if someone was really ripped off or not?

The reason why is he wants two bites at the apple. He wants you to believe, hey, man, this was

66

not ripoffs. They were dope dealers. There's this, there's that. And if you don't believe that, my guy wasn't there.

Again, it's disingenuous to you to present to you two different scenarios here. And it's all in an attempt to have your attention diverted away from the fact that he's guilty and hopefully they can pull off their magic trick.

Make no mistake. If he walks, if Sam Fletcher walks out of this courtroom, that's a magic trick. Because what happens when people's homes are broken into and guns are drawn? People die. You hear that on the news constantly. That's a dangerous situation. And the fact that we have somehow lost that, the fact that we have somehow forgot the fact that these people were placed with towels over their heads, guns to there head, "We're going to kill you," do you feel that? Probably not because this is a trial. Very sanitary in this courtroom. But I guarantee you those people were scared out of their minds in that house. It's a dangerous, important thing to what happened to them. And what's more important is we've got to hold people responsible when that happens.

So, let's look at the evidence. Don't look at one piece of evidence. Don't divert your attention away to what we don't have. Each piece of evidence is a bread crumb on the trail to who's guilty. Don't look at each piece of evidence just by itself. Look at it. What does it add up to? And then ask yourself, if it adds up to Sam Fletcher, he's guilty.

So, I ask you: What's the evidence? What is it that makes him guilty? Unfortunately in this courtroom setting you can't tell me, "Hey, Josh, this is how you prove the case to me." If you could, it would be a lot easier.

But if that were how we did it, if I could just say to you at the end, "Hey, how do I prove this to

you," I reckon here's what we would say: After hearing their testimony, what you would want to know is is for someone to be guilty, how are they tied to the police boots? You'd want to know that.

Guess what? He talks about wearing police boots in his interview. He says that they're lace-ups. He says that they're boots. The fact that Doc Holliday didn't record it very well, it's a problem. We should have taken it into custody. He should have taken a picture.

But at least Wyatt had the sense to talk to the Defendant about the fact that he was wearing. He calls them, and I quote from his interview, "These are my lace-up boots." Yeah, they're lace-up boots. He says it.

And when Wyatt says, "Just like police boots," his response is, "Yes." Is he miraculously wearing police boots lost in a forest when people are running with police boots from a home invasion? That's not a coincidence.

What else would you want to know? You would probably say to me, "Well, hey, the people who did this were dressed in black." So, I ask you: What was the Defendant wearing? All black. He had blue jeans, dark colors. He had on a long-sleeved black T-shirt and police boots.

Because I started adding all this together. And it's miraculous that he exactly matches the description given by these people. And let me tell you something about these people. If they wanted to lie, why don't they just say it's him, Fletcher? Why don't they just say, "Yeah, I see him in the courtroom. He's right there." Because they're not going to lie. Everybody was wearing masks.

But you would want to know if Sam Fletcher wore those two things if you were going to find him guilty. You'd want to know if the person who is

guilty is African-American or Hispanic. You would want to know that.

You would want to know that because the description that they're African-American. And you know what's miraculous about this whole thing? When Sam Fletcher gives his interview, he doesn't know what we know, you know who he starts talking about? African-Americans and Hispanics. It's amazing that what he talks about totally matches up with these people. Because who is involved? African-Americans and Hispanics. So, the person who is guilty would have to be African-American or Hispanic.

Next thing you'd want to know is is he tied to the money in the house? A guilty person tied to the money in the house. Guess what's in his pocket? $5,900 wrapped up in rubber bands, little girl's rubber bands just as described by the Complaining Witnesses. Little girl's hair rubber band.

Not only that, he actually says, "It was in my pocket." In minute 49 of his statement, he says, "Yeah I had the money in my pocket." And, "Yeah, they had rubber bands." You just hear him talking about anybody put rubber bands on them.

It's not just that anybody put rubber bands on them. It's that you have this plus this plus this plus this. You would want all that to find somebody guilty.

You would want to know about that black and white mask. Because Luis says there's a black and white mask. He says it's got skulls on it. His exact testimony, "It was kind of like a biker bandanna that they put over their mouth."

And you know where this bandanna was found? Next to the Defendant's phone where he says he was sitting. You would want to know that. Guess what? We have it.

69

Not just that, he says on one hour and 32 minutes, he said, "I had a bandanna." And at one hour and 41 minutes of his statement he says, "I had a black and white bandanna." And at one minute and 50 seconds -- or excuse me, one hour and 50 minutes, he says he, "Had a black and white bandanna around my neck and I had -- I dropped it somewhere."

What about the phone in the car? It's his. I don't know what else to tell you. You'd want to know is somebody's phone in that car? Is that his? A guilty person's phone would be in that car.

Running from police. Hiding in the woods. Asked for a ride away from the scene. All of these things you would expect if the person was guilty of what just happened, all of these things, you would want to know. Did he do these things?

Here's a big one: Knows things that only the persons in the house would know.

THE COURT: Five minutes, Mr. Phanco.

MR. PHANCO: Thank you.

But does he know things that only the person in the house would know? I mean, how about this: He wanted to talk to you about a revolver. He says there was a revolver that went inside the house. "What did you do with the revolver?"

"I just threw in the back." Guess what? That revolver is thrown in the back. It's underneath a bag. You can't just throw it in the back and get it underneath a bag. This one. We just see it kind of sticking out. See it? It's hard to see. Right there. Because the rest of it is under a bag because it's not tossed behind him.

How did he know about it? Because it wasn't tossed back there. It was placed back there. And the reason why he knew about it, because he saw in the house.

70

The fact that he says there's a gun, he says, AK-47. It was like a military gun. It had all the bullets on the side. Guess what? You see it right there? You see all the bullets on the side? Nope. But when we pulled it out, we had a picture with all the bullets on the side. And he didn't say he tossed it in the back. So, how did he know there's bullets on the side? Because he saw it inside the house.

The point being is simple, very simple. If you asked me here's how you prove a guilty person, you know what you come up with? Sam Fletcher and all the things you want to know when you find someone guilty. So, when I'm asking you to find Sam Fletcher guilty, I'm not saying just because he had on police boots. And I'm not saying just because he's a black male standing in the woods. I'm saying it's because of all of these things, the fact that's tied to the money in the house, black and white mask, phone in the car, runs from police, hides in the woods, asked for a ride away from the woods, lies in his interview. Says he touched the police vest because he was worried, well, what happens if they find something on the police vest? So, he starts hedging his bets on the police vest. He's found in an area when he doesn't even live on that side of the town.

The fact of the matter is when you look at it all together, it comes to one point: That Sam Fletcher is guilty. And here's what's great. He says it wasn't $30,000. She says a little under that. And he has $5,800 in his pocket.

You want to know why Sam Fletcher is guilty? Because he got his cut of the money. Take 29,500, maybe I'm guesstimating. You divide it by five people because in one hour and 29 minutes in that interview he says there's five people in that white car running away from that house. Divide that by

71

five and you've got the exact cut sitting in his pocket.

Coincidence? Is it the same coincidence that puts all this around him? At some point the coincidences aren't just bread crumbs. They're bread crumbs that lead you to the guilty person. And I got news for you. If you've never sat in a room with a person who's done an aggravated robbery, who put guns to someone's head, today is your day. You're sitting in the room.

So, what normally happens at this point is that a lawyer will look at you guys and say, "Now the hard work begins. Go, good luck and thank you for your time and thank you for your deliberations." I'm not thanking you for your deliberation. I'll tell you exactly this.

THE COURT: One minute.

MR. PHANCO: Thank you, Judge.

People stay up at night watching the news just like me and my wife. And you see things happen to people like what happened to them. And you say to yourself, "Why doesn't somebody do something?"

I feel privileged to give you the opportunity now to do something, to not go for the diversion of attention that they want you to go for. I'm giving you that opportunity to do something when you've got someone facing you who's an aggravated robber and the bread crumbs lead right back to him. I'm giving you the opportunity to go back there and say guilty. Because that's what he is.

Here's the beauty part of it: When you come back out and you say he's guilty because everything leads to that, when you say that, he won't be shocked because he already knows it. Thanks.

Dkt 25-11at 106–18.

Fletcher fails to demonstrate that Williams was ineffective for failing to object to improper jury argument.

72

Under Texas law, proper jury argument falls into one of four categories: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answers to argument by opposing counsel; and (4) a plea for law enforcement. *Freeman v State*, 340 SW3d 717, 727 (Tex Crim App 2011). Fletcher asserts that Williams was ineffective for failing to object to several statements during the prosecution's closing argument.

The prosecutor's arguments fell within the four permissible areas for a closing argument. The jury heard evidence that (i) an aggravated robbery took place at the Villanuevas' house; (ii) the white jeep was the get-away car that contained all the instrumentalities, weapons, and spoils of that robbery; (iii) Fletcher was dressed in black and is similar in size and description to the descriptions given by the robbery victims; (iv) Fletcher changed his story, first claiming he was not involved at all, then claiming he was hired by a drug dealer to move a vehicle from one location to another for $350; (v) then he changed his story completely, claiming that he was picked up by men he did not know, waited a significant amount of time for a white jeep to show up, got into the jeep and ran from the police; (vi) Fletcher's cell phone was found in the jeep; (vii) he had thousands of dollars cash in his possession bundled in the same manner as the money stolen from the Villanuevas' home; and (viii) Fletcher offered varying accounts of how his cell phone ended up in the jeep (first that he dropped it reaching into the vehicle, and then that he dropped it because he was riding in or driving the jeep) and how he ended up with $5,900 in cash bundles (first that he stole it from the Jeep after spotting it through the window, and then that he stole it from the floorboard of the vehicle because one of the robbers dropped it there and the robbers were not paying attention to it).

Given the jeep's undeniable association with the robbery, the victims' descriptions of the perpetrators, and Fletcher's ever-changing story, a rational jury could have determined that Fletcher participated in the robbery or—

73

at a minimum—intended to aid those who did. Fletcher's instances of alleged prosecutorial misconduct and improper jury instruction do not so infect the trial as to render it fundamentally unfair. Fletcher does not explain how the alleged misstatement of the law of parties was in fact a misstatement. See Dkt 1 at 34. The alleged comment on Fletcher's failure to testify was actually a comment on Fletcher's failure to furnish evidence in his possession that he alleged was exculpatory. Dkt 25-11 at 107. The allegedly improper conscience-of-the-community arguments were pleas for law enforcement, a proper jury argument under Texas law. See *Freeman v State,* 340 SW3d 717, 727 (Tex Crim. App. 2011), citing *Brown v State,* 270 SW3d 564, 570 (Tex Crim App 2008); see also *United States v Ruiz,* 987 F2d 243, 248–49 (5th Cir 1993) ("It is well-settled that, unless the prosecutor intended to inflame, an appeal to the jury to act as the conscience of the community is not impermissible."), quoting *United States v Phillips,* 664 F2d 971, 1030 (5th Cir Unit B 1981); *United States v Valas,* 822 F3d 228, 243 (5th Cir 2016) (same). And the alleged bolstering that the complainants were "cooperative" was supported by the record. Yaneth Villanueva testified that she had spoken with all three of the district attorneys who were at various points assigned to Fletcher's case, implying her cooperation over a length of time. See Dkt 25-10 at 14–15.

Thus, the prosecutor's arguments fell within the four permissible areas for a closing argument. And regardless, any possible harm from the prosecutor's argument was cured by the trial court's instruction to the jury that statements by counsel do not constitute evidence. Dkt 40-23 at 63.

The burden is even more difficult in this case because Fletcher must not only show improper jury argument rising to the level of a constitutional impairment of a fundamentally fair trial, but he must also show that his trial counsel was constitutionally ineffective in failing to object to the argument. *Bridge v Lynaugh,* 838 F2d 770,

74

774 (5th Cir 1988) (cleaned up). Williams's failure to object was not unreasonable trial strategy, given the permissible areas of argument being made. Furthermore, the prosecutor's statements weren't so inflammatory that they rendered the trial fundamentally unfair. Even if the failure to object could be classified as deficient performance, Fletcher has shown no prejudice from the lack of objection.

Further, in addition to the *Strickland* presumption that counsel's conduct falls within the wide range of reasonable professional assistance, the nature of Fletcher's particular argument here requires him to overcome a substantial barrier to relief: "A decision not to object to a closing argument is a matter of trial strategy," and the Fifth Circuit have previously declined to disturb a state *habeas* court's conclusion that failure to object at closing did not render trial counsel's assistance ineffective. *Drew v Collins,* 964 F2d 411, 423 (5th Cir 1992).

In this case, the record makes it clear that the improper prejudicial effect of the prosecutor's remarks, if any, was slight. The court cautioned the jury, before the State's opening statement, that attorneys' arguments were not evidence. Dkt 25-9 at 11–12. *United States v McWaine,* 243 F3d 871, 873 (5th Cir 2001) (finding that a prosecutor's statements did not warrant a new trial because the trial judge carefully instructed the jury at least twice that a lawyer's statements are not evidence and to consider only the evidence introduced). There was ample evidence linking Fletcher to the crime. See Section 4 above.

The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 20 will be denied.

    k. Failing to stipulate to a proper supple-
mental *Allen* charge or failing to object to
the court's supplemental jury instruction
(Ground 22)

Fletcher complains that Williams rendered ineffective
assistance by failing to ask the trial court for specific jury
instructions when the jury returned a nonunanimous
verdict and for failing to object to the trial court's
"modified, coercive, suppl[e]mental *Allen* charge." Dkt1 at
38.

An *Allen* charge "refers to case *Allen v United States*,
174 US 492 (1986). The term is used generally in reference
to supplemental instructions urging a jury to forego their
differences and come to a unanimous decision." *United
States v Eghobor*, 812 F3d 352, 357 n 2 (5th Cir 2015). An
*Allen* charge, sometimes referred to as "dynamite charge,"
essentially informs a deadlocked jury that the issues it is
discussing will be the same for a future jury and to keep
deliberating, but while considering the government's
burden. In the Texas courts, the providing of the *Allen*
charge is within the discretion of the trial judge. See
*Barnett v State*, 189 SW3d 272, 277 n 13 (Tex Crim App
2006) (noting that while "such a charge is permissible in
both the federal system and Texas courts, trial courts [in
Texas] must be careful to word it and administer it in a
non-coercive manner").

The state court's determination comports with federal
law and was not unreasonable. Indeed, the instruction
largely parallels that of the *Allen* case itself. *Allen v United
States*, 164 US 492, 501 (1896). Further, the Fifth Circuit
has upheld versions of the *Allen* charge so long as they
avoid the pitfalls of coercive deadlines, threats of marathon
deliberations, pressure for surrender of conscientiously
held minority views, or any implication of a false duty to
decide. See *United States v Eghobor*, 812 F3d 352, 358 (5th
Cir 2015), citing *United States v Scruggs*, 583 F2d 238, 240
(5th Cir 1978), quoting *United States v Skinner*, 535 F2d
325, 326 (5th Cir 1976). Nothing in this record suggests

that the jury was unconstitutionally coerced into reaching a verdict or that the charge in its full context rendered Fletcher's trial fundamentally unfair. The charge gave no deadline, did not instruct the jury that it *had* to reach a verdict, or otherwise pressure the jury to reach a verdict. Rather, it "did more to *encourage* the jurors to reach a verdict than it did to coerce them" if it could "do so without doing violence to" his or her conscience. *Boyd v Scott*, 45 F3d 876, 883–84 (5th Cir 1994) (emphasis in original).

After Juror 1 indicated that the guilty verdict was not her own, the trial court instructed the jurors:

> All right. Ladies and gentlemen of the jury, the verdict has to be a unanimous verdict. I mean all 12 of the jurors have to agree to a either guilty or not guilty verdict. So, I am going to send you back to the jury room to continue your deliberations.

Dkt 25-11 at 123.

The instructions given by the trial court were consistent with normal *Allen* charges, were not coercive, and contained none of the "dynamite" language prohibited by the Supreme Court. Fletcher hasn't shown that the court's charge, under the totality of the circumstances, was so coercive as to have unconstitutionally rendered his trial fundamentally unfair. Fletcher thus has not shown that a failure to object constituted deficient performance or that he was prejudiced by the failure to object to the *Allen* charge. And he has not indicated what would have been his preferred instruction that Williams should have requested.

The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 22 will be denied.

77

l.   Right to testify (Ground 19)

Fletcher maintains that he wanted to testify during the hearing on his motion to suppress and at trial, but that Williams "dissuade[d]" him. Dkt 1 at 34.

A defendant has a fundamental constitutional right to testify in his own behalf. *Rock v Arkansas*, 483 US 44, 49–52 (1987). This right belongs to the defendant personally and cannot be waived by counsel. *Emery v Johnson*, 139 F3d 191, 198 (5th Cir 1997). However, "[a] defendant who argues that his attorney prevented him from testifying must still satisfy the two prongs of *Strickland*." *United States v Harris*, 408 F3d 186, 192 (5th Cir 2005). Under *Strickland*, the inquiry must be on "whether or not [Petitioner] made a knowing waiver of [her] right to testify." *Bower v Quarterman*, 497 F3d 459, 473-74 (5th Cir 2007). Assuming counsel adequately informed Petitioner of his right to testify, evaluation is then of counsel's strategy in advising Petitioner against exercising that right. Ibid. Even then, "it cannot be permissible trial strategy, regardless of its merits otherwise, for counsel to override the ultimate decision of a defendant to testify contrary to his advice." *United States v Mullins*, 315 F3d 449, 453 (5th Cir 2002) (citation omitted).

Williams testified:

5. I did not prevent Mr. Fletcher from testifying at trial.

6. I admonished Mr. Fletcher that it was solely his decision if he desired to testify at trial on his o[w]n behalf. I explained to him if he should testify, then his prior convictions for Aggravated Assault of a Peace Office in 1996 and his federal conviction for Conspiracy and Armed Bank Robbery Aiding and Abetting on November 9, 1995, which he was sentenced to 188 months would be exposed to the jury. Mr. Fletcher also gave a voluntary video statement which I explained to him would be used to impeach any testimony given by him at trial. The video statement did not support an alibi defense or

provide any rational defense theory to present at Mr. Fletcher's trial. I informed Mr. Fletcher that in my professional opinion, I did not believe it was in his best interest to testify, but the decision was strictly up to him. After giving Mr. Fletcher the aforementioned advice, he freely and voluntarily chose not to testify.

7. The Applicant was admonished by me regarding his right to testify at trial. He made voluntary intelligent and knowing decision not to testify at trial.

Dkt 25-42 10–11.

The state *habeas* court found that:

13. In the Applicant's seventeenth ground for relief he argues he received the ineffective assistance of counsel due to trial counsel allegedly failing to advise the applicant of his right to testify in his own defense and for refusing to allow the applicant to testify. *Applicant's Writ at 35-36.*

14. The Court finds, based on the credible affidavit of trial counsel, that trial counsel fully advised the applicant of his right to testify on his own behalf and the applicant, knowingly and voluntarily chose not to testify. *Affidavit of Cornell Williams.*

15. The Court finds, based on the credible affidavit of trial counsel, that trial counsel did not prevent the applicant from testifying. *Id.*

16. The Court finds, based on the credible affidavit of trial counsel, that trial counsel accurately advised his client about the admissibility of the applicant's prior robbery and aggravated assault convictions and the possibility of impeachment with his prior statements in an effort to provide legal advice to his client while allowing the applicant to make his own decision. *Id.*

79

Dkt 25-42 at 5–6.

Fletcher indicates that if he had been allowed to take the stand, he would have testified that (i) he sustained a gunshot wound to the right hand; (ii) he agreed to pick up the car for a person known as Big Escalade because Fletcher's hand injury prevented him from working; (iii) Luis Villanueva, the kidnap victim, orchestrated the staged robbery and was a drug dealer, along with his wife; (iv) the nearly $30,000 in their home were drug proceeds; (v) the cell phone data on Fletcher's phone showed that he didn't commit the offense; (vi) his custodial interrogation was illegal because he never received his *Miranda* warnings; and (vii) he provided substantial assistance to law enforcement to learn the identities and address of the perpetrators, including a man known as Big Escalade. Dkt 25-44 at 117, 176. He argues that, because he did not testify, (i) he was precluded from having the jury observe his demeanor and judge his credibility first-hand, and (ii) the jury was unable to hear medical and alibi testimony tending to exculpate him. Dkt 58 at 48.

Fletcher does not explain how the outcome of trial would have been different if he had testified. The jury heard the frightening details of (i) the home invasion; (ii) law enforcement officers' high-speed pursuit of the white getaway jeep; (iii) how Fletcher was found trespassing in a railway yard; (iv) how Fletcher admitted to being extremely thirsty because he was running from the police; (v) how he was detained by K-9 officers; (vi) his two-hour statement to the police in which he provided several explanations for his actions on the date of the offense; (vii) Fletcher was wearing black clothing and police-style lace-up boots; (viii) he was found with $5,900 in his pocket; and (ix) his cell phone was found in the getaway vehicle.

The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an

unreasonable application of, clearly established federal law.

Ground 19 will be denied.

> m. Failing to notify the court of juror misconduct (Ground 23)

Fletcher asserts that Williams rendered ineffective assistance by failing to notify the court of juror misconduct "immediately [after] learning of it." Dkt 1 at 38. Fletcher alleges that, after the verdict was read, Juror 1 "approached his mother" and explained that "her verdict was not her own" and that she wanted to speak "with the judge or defense counsel." Id at 39.

The trial court made the following findings of fact following the motion for new trial hearing:

> 1. The applicant's claim that the verdict was decided in a manner that was not a fair expression of the jurors' opinion is without merit.

> 2. The record reflects that despite one juror's initial response that the verdict was not unanimous, after additional deliberation, when the guilty verdict was taken, each juror responded that "this was [their] verdict."

> 3. No juror was present at the motion for new trial hearing

> 4. No evidence of any kind was presented of any outside influence upon the jury.

> 5. No evidence of any kind was presented that any juror was not qualified to serve.

> 6. The only evidence presented at the motion for new trial was that the same juror who had initially stated that the guilty verdict was not her verdict entered the courtroom after sentencing.

> 7. The court did not consider any statement (which was attempted to be entered into evidence via either hearsay or a bill of exception) which

81

purported to be an inquiry into the validity of the verdict, in accordance with Tex. Rule Evid. 606.

8. The evidence presented at the motion for new trial demonstrated that the defendant's mother and friend were aggressive with the juror after sentencing and Deputy Hernandez, the bailiff, intervened.

9. According to the credible testimony of Deputy Hernandez, Hernandez separated the juror from the defendant's supporters, and gave the juror the opportunity to wait to speak with the State, the defense attorney, and/or the judge, and the juror declined

10. The evidence demonstrates the verdict was decided in a regular manner, and was a fair expression of the juror's opinion.

11. No credible evidence was presented to show that the jury verdict of guilty was against the weight of the law and evidence.

Dkt 25-3 at 137–138.

Fletcher has failed to show that any members of the jury engaged in misconduct. The state *habeas* court found that Fletcher failed "to prove any deficiency . . . or . . . any resultant harm." Dkt 25-42 at 7 (no. 1).

The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 23 will be denied.

### n. Conflict of interest (Ground 29)

Fletcher complains that Williams rendered ineffective assistance because he had a conflict of interest. Dkt 1 at 45. Fletcher alleges that Williams would only advance his "claims or case" if Fletcher paid "additional fees." Ibid.

82

Conflicts of interest occur when counsel "is prevented, by his own self interest or by his interest in another's welfare, from vigorously promoting the welfare of his client." *Vega v Johnson*, 149 F3d 354, 360 (5th Cir 1998). To establish a Sixth Amendment violation, "a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v Sullivan*, 446 US 335, 350 (1980). An actual conflict of interest "exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." *Perillo v Johnson*, 205 F3d 775, 781 (5th Cir 2000). Fletcher's allegations don't establish any actual conflict of interest with Williams, so any conflict claim is without merit and should be denied.

Williams testified:

> 8. I did not condition the extent of defense investigation on payment of additional fee. As with all of my criminal cases, I conduct my own investigation of the facts and any possible legal defenses. I give the client the option of hiring an independent investigator at their own cost. Mr. Fletcher never paid a cost deposit for an investigator because there was not a need for any additional independent investigation.

Dkt 25-42 at 11.

The state *habeas* court found that:

> 8. The Court finds the affidavit of Cornell Williams to be credible, reliable and persuasive. *Id.*
>
> . . .
>
> 17. In the Applicant's twenty seventh ground for relief he argues he received the ineffective assistance of counsel due to trial counsel allegedly conditioning further investigation into the applicant's case on further payment of fees to counsel. *Applicant's Writ at 51.*

83

18. The Court finds, based on the credible affidavit of trial counsel, that trial counsel did not condition the extent of defense investigation on the payment of fees. *Affidavit of Cornell Williams*.

19. The Court finds, based on the credible affidavit of trial counsel, that trial counsel performed a full investigation into the facts and possible legal defenses. *Id*.

20. The Court finds, based on the credible affidavit of trial counsel, that counsel gave the applicant the option to hire a private investigator if he believed one was needed, however both counsel and the applicant determined that no further investigation was needed. *Id*.

Dkt 25-42 at 5–6.

Fletcher hasn't shown that a plausible defense strategy or tactic might have been pursued but was not because of a conflict of interest. See Dkt 1. Fletcher hasn't shown deficient performance and ensuing prejudice to establish ineffective assistance by his trial counsel. See *Strickland v Washington*, 466 US 668 (1984). The state court's factual determinations are presumed to be correct. Fletcher hasn't rebutted those findings with clear and convincing evidence. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 29 will be denied.

o.  Failing to advocate (Ground 30)

Fletcher asserts that Williams rendered ineffective assistance because of his "total failure to advocate on [Fletcher's] behalf." Dkt 1 at 46. He points to all of his ineffective assistance of trial counsel claims in support. Ibid. The cumulative effect of the various errors resulting from the ineffective assistance of counsel, he says, merits federal *habeas* relief. Dkt 3 at 25.

The cumulative-error doctrine provides that "an aggregation of non-reversible errors (that is, plain errors

84

failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v Munoz*, 150 F3d 401, 418 (5th Cir 1998), cert denied, 525 US 1112 (1999). However, Fletcher has failed to establish any error in his trial. Relief thus isn't available under the cumulative error doctrine. See *United States v Williams*, 264 F3d 561, 572 (5th Cir 2001) (no cumulative error where defendant failed to identify single error in jury selection); *Miller v Johnson*, 200 F3d 274, 286 (5th Cir 2000) (petitioner who failed to demonstrate any error by trial counsel could not establish cumulative error).

Ground 30 will be denied.

> p. Failing to notify Fletcher of a plea deal (Ground 32)

Fletcher alleges that he learned from Williams's affidavit that the State had offered a plea deal of eight years. Dkt 1 at 47. He maintains that had he known of this offer, he would have accepted it. Ibid.

Williams testified as follows:

> 9. Although the evidence regarding Mr. Fletcher's guilt was overwhelming, he refused all plea offers from the State. The last offer made the day of trial was 8 years in the Texas Department of Corrections. Mr. Fletcher's explanation regarding the offense was that he received an offer from a person known as "Big Escalade" on the south side of Houston to drive a car to the north side of Houston for a fee. He claimed that once he met up with other persons on the north side of Houston to drop the car off, law enforcement officers arrived on the scene. Once Mr. Fletcher saw the officers, he became afraid and decided to run. Mr. Fletcher evaded the officers by running into a wooded area near a train yard off the Hardy Toll Road. After hours of searching for Mr. Fletcher, he claimed he voluntarily surrendered to law enforcement. The evidence presented at trial indicated Mr. Fletcher

fit the physical description of one of the persons who robbed a residence of money and assaulted one of the residents of the house. Mr. Fletcher at all times maintained that he was innocent and wanted to cooperate with the authorities to help apprehend those responsible for the crime. However, the jury unanimously believed the evidence presented by the State and found Mr. Fletcher guilty of aggravated robbery.

Dkt 25-42 at 11.

The state *habeas* court found that trial counsel's affidavit was "credible, reliable, and persuasive." Dkt 25-42 at 5 (no. 8). Fletcher provides no evidence to rebut the presumption of correctness of the state court's findings under AEDPA. 28 USC § 2254.

Furthermore, Fletcher's recollection of a meeting with Williams substantiates the attorney's affidavit. In Fletcher's recollection, Williams was persistent in his view that Fletcher should take a plea deal offered by the State, and Fletcher was adamant that he would not:

Mr. Williams immediately began to attempt to dissuade me from going to trial and, instead, to simply plea to the offense and throw myself at the mercy of the court.

. . .

Mr. Williams told me that I WAS damned if I went to trial, and that my only "saving grace" was for him to go to the judge for punishment; and, see what the State would offer. I stated to Mr. Williams that, "basically you're telling me to take some time" and "to plead guilty for some shit I didn't do."

. . .

Mr. Williams then stated to me the following: "You don't have a whole lot of shit to work through. You really don't, but you want a trial. But what I'm trying to do is go to the judge for punishment." I then affirmatively and conclusively stated to Mr.

86

> Williams: "I'll tell you like this. Cut and Dry.
> Before I plead guilty to something I didn't do, and
> take any time, GIVE ME LIFE. Y'all just have to
> nail me to the Fuc...g cross, man. My life is void
> anyway. It's over with. Basically what you're
> telling me is my life is my life is over with. You
> don't have anything to fight with. They're going to
> f..k [me] in trial." Mr. Williams responded by
> telling me that he was giving me a chance to make
> a deal.

Dkt 25-44 at 117, 119, 122.

Fletcher argues that this colloquy between Fletcher
and Williams took place on June 30, 2015. It referred to a
thirty-year plea offer. Dkt 58 at 82. Fletcher contends that
the eight-year plea offer was made on the morning of trial,
October 14, 2015. Dkt 58-at 82–83.

The state court's factual determinations are presumed
to be correct. Fletcher hasn't rebutted those findings with
clear and convincing evidence. He hasn't shown that the
decision of the state court was contrary to, or involved an
unreasonable application of, clearly established federal
law.

Ground 32 will be denied.

### 7. *Brady* violation (Ground 12)

Fletcher contends that his right to due process under
the 5th, 6th, and 14th Amendments was violated by the
State's failure to disclose *Brady* material. Dkt 1 at 26–28.
Fletcher contends that in its discovery packet the State
failed to include or disclose (i) forty-three photographs
attached to Deputy Constable Griffin's police report; (ii)
footage from Deputy Constable Gennusa's dash camera;
(iii) the second audio recording of Fletcher's interrogation;
and (iv) the memory and location data stored in Fletcher's
cell phone. Id at 26.

The Supreme Court in *Brady v Maryland*, 373 US 83,
87 (1963), held that the suppression by the prosecution of
evidence favorable to an accused after a request violates

87

due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, Fletcher must prove that the prosecutor suppressed or withheld evidence that was both favorable and material to the defense. *Moore v Illinois*, 408 US 786, 794–95 (1972); *Ogle v Estelle*, 641 F2d 1122, 1124 (5th Cir 1981). Evidence is *material* only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v Bagley*, 473 US 667, 684 (1985). A *reasonable probability* is a probability sufficient to undermine confidence in the outcome of the trial. Id at 678, 684. Finally, the Fifth Circuit holds, "Mere conclusory statements do not raise a constitutional issue in a habeas case." *Schlang v Heard*, 691 F2d 796, 799 (5th Cir 1982).

Fletcher fails to establish that his *Brady* claim has merit. *Brady* claims involve "the discovery, after trial of information which had been known to the prosecution but unknown to the defense." *West v Johnson*, 92 F3d 1385, 1399 (5th Cir 1996) (citation omitted). Here, there was no newly discovered evidence because nothing was suppressed or withheld from the defense. Evidence is not "suppressed" if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence. *West*, 92 F3d at 1399.

*As to Deputy Griffin's photographs,* Fletcher argues that these would have shown the jury that the guns were visible and not covered up as in later-in-time photographs, corroborating Fletcher's account that he could see the guns in the Jeep. Dkt 1 at 26–27.

*As to Deputy Gennusa's dash camera video,* Fletcher argues that it would have demonstrated that Fletcher was not the getaway driver and that his clothes did not match the suspect's clothing as described by the victim. Dkt 1 at 27. The only evidence that such a dash cam video exists is the following exchange at trial:

Q. Okay. I'll be brief. Basically you didn't have a camera, recorder on your car, did you?

A. I did.

Q. Okay. Did you record these events?

A. Yes, sir.

Q. Okay. And did you tender that recorder to the District Attorney's Office?

A. I have no way of doing -- it's a digital, electronic.

Q. So, there is a recording of this from your car from somewhere; is that correct?

A. Should be.

Q. All right. Have you reviewed this particular recording?

A. No, sir.

Q. You haven't seen it?

A. No.

Dkt 25-10 at 165–66.

*As to the second audio from Fletcher's interrogation,* Fletcher contends that he was interrogated by officers as they went through his cell phone's data and location history, that this interrogation was recorded, and that the audio file was "uploaded to the "e-file system"" but was never disclosed. Dkt 1 at 27. He doesn't reveal how this allegedly suppressed material would have been favorable to his defense. See ibid.

*As to Fletcher's cell phone data,* Fletcher contends that Detective Wyatt "removed [Fletcher's] cell phone from evidence and released the cell phone to another officer to be given back to [Fletcher]." Ibid. Fletcher contends that he was "precluded from presenting the material information that was located in, and removed from, his cell phone. He doesn't allege what this data would have shown. See ibid.

Taken together, these allegedly suppressed *Brady* materials were not material to Fletcher's guilt or punishment. See Dkt 1 at 26–28. The result of the

proceeding would have been the same due to the overwhelming evidence both direct and circumstantial that Fletcher participated in the robbery, and which remains intact even in light of the alleged *Brady* materials. Fletcher does not dispute that an aggravated robbery took place at the Villanuevas' house, or that the jeep was the getaway car that contained all the instrumentalities, weapons, and spoils of that robbery. Dkt 25-5 at 37. Fletcher was dressed in black, as shown by State's Exhibits 70, 71, 124, and 125, and is similar in size and description to the descriptions given by the robbery victims. Dkt 25-5 at 37; Dkt 25-15 at 7, 9, 106, 107. Fletcher's cell phone was found in or around the jeep, and he had thousands of dollars of cash in his possession bundled in the same manner as the money stolen from the Villanuevas' home. Dkt 25-5 at 37. Even if Fletcher had shown that the alleged *Brady* material was suppressed and was favorable to him, he has not shown by clear and convincing evidence that but for the alleged *Brady* violations, not a single reasonable juror would have found him guilty of aggravated robbery with a deadly weapon.

Fletcher hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 12 will be denied.

8.  Ineffective assistance on appeal (Grounds 26, 27, 28, and 31)

Fletcher argues that his appellate counsel, Thomas J. Lewis, rendered ineffective assistance by (i) failing to advocate in the motion for new trial (Ground 25); (ii) repeatedly displaying a conflict of interest in favor of trial counsel (Ground 26); (iii) preparing and filing an erroneous appellate brief, "grossly" misstating facts and evidence (Ground 27); (iv) failing to raise and advance meritorious issues (Ground 28); and (v) totally failing to advocate on Fletcher's behalf (Ground 31). Dkt 1 at 12–47.

A criminal defendant is constitutionally entitled to effective assistance of appellate counsel when he has a

90

right to appeal under state law. *Evitts v Lucey*, 469 US 387 (1985); *United States v Phillips*, 210 F3d 345, 348 (5th Cir 2000). The *Strickland* standard applies to complaints about the performance of counsel on appeal. See *Smith v Robbins*, 528 US 259, 285 (2000). And so to obtain relief, Fletcher must demonstrate that appellate counsel's conduct was objectively unreasonable under then-current legal standards, and that there is a reasonable probability that, but for the deficient performance, the outcome on appeal would have been different. See *Smith*, 528 US at 285; *Higgins v Cain*, 720 F3d 255, 260–61 (5th Cir 2015).

  a. Failing to advocate in the motion for new trial (Ground 25)

Fletcher complains that his interim appellate counsel was ineffective for failing to "properly prepare for or advocate" during the hearing on Fletcher's motion for a new trial. Dkt 1 at 40–41. Fletcher states that he provided interim appellate counsel with "a list of issues" and "where counsel . . . could find the evidence to support such grounds," but interim counsel told him that "all of the paper records were of little or no use," failed to force the missing witness Juror 1 to appear, and failed to move the trial court to order trial counsel's appearance at the hearing. Id at 40–41.

Fletcher can't prevail on his claim of ineffective assistance of appellate counsel because he hasn't shown that interim counsel's actions fell below an objective standard of reasonableness and that he suffered prejudice as a result. *Strickland,* 466 US 668. Fletcher has failed to establish that but for interim counsel's alleged errors, the trial court would have granted Fletcher's motion for a new trial. Nor does he present viable grounds for a motion for new trial that, if pursued by counsel, would have culminated in a new trial. See Dkt 1 at 40–41.

Ground 25 will be denied.

91

b.   Conflict of interest (Ground 26)

Fletcher contends that Lewis rendered ineffective assistance because he repeatedly displayed a conflict of interest against Fletcher, and in favor of trial counsel. Dkt 1 at 41–42. According to Fletcher, Lewis displayed this conflict of interest by stating that the motion for new trial would likely not be granted, soliciting payment despite having been paid already, and for failing "to operate as the counsel [e]nvisioned by the framers of the United States Constitution." Id at 41.

In claims of ineffective assistance based on a conflict of interest, a petitioner must show an actual, rather than speculative or potential, conflict of interest existed which compelled counsel to compromise duties of loyalty or zealous advocacy to his client, affecting his performance at trial. *Bostick,* 580 F3d at 307; see *Cuyler,* 446 US 335; see also *Strickland,* 466 US at 692–93. An *actual* conflict of interest "exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." *Perillo v Johnson*, 205 F3d 775, 781 (5th Cir 2000).

Fletcher's allegations don't establish any actual conflict of interest with Williams, so any conflict claim is without merit and should be denied. He hasn't shown how Lewis was required to choose between advancing Fletcher's interests and advancing his own or other interests, to Fletcher's detriment. See Dkt 1. And he hasn't shown that a plausible strategy that might have been pursued but for the alleged conflict. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 26 will be denied.

     c.   Preparing and filing erroneous appellate brief (Ground 27)

Fletcher contends that Lewis rendered ineffective assistance by filing an "erroneous" appellate brief that "misstated" facts and evidence. Dkt 1 at 42. According to Fletcher, Lewis made factual errors that (i) Fletcher "admitted" having been the driver of the vehicle; (ii) references to Fletcher as the "getaway driver" and cash in Fletcher's possession; (iii) conflating Juror 1 with another juror that slept during the proceedings; and, (iv) misstatements regarding the contents of the jeep. Id at 42–43.

Appellate counsel who files a merits brief needn't and shouldn't raise every non-frivolous claim. Such counsel may instead select from among available arguments in order to maximize the likelihood of success on appeal. *Smith*, 528 US at 288; *Jones v Barnes*, 463 US 745, 751 (1983). The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v Murray*, 477 US 527, 536 (1986); *Jones*, 463 US at 751–52. Moreover, the Supreme Court instructs in this regard that appellate arguments that assertedly should have been raised are considered by comparison to arguments that were raised. Declining to raise a claim on appeal isn't deficient performance unless that claim was plainly stronger than those actually presented to the appellate court. See *Davila v Davis*, 137 S Ct 2058, 2067 (2017); *Smith*, 528 US at 288.

The First Court of Appeals summarized Fletcher's grounds for appeal as follows:

     I.  "Appellant moved to suppress the audio recording of his interview with the deputy sheriff on the ground that he had asked to speak to a lawyer. Miranda requires that custodial interrogation must cease once the right to counsel has been invoked. However, the deputy sheriff continued the interview for a period of two hours.

By the officer's testimony, Appellant reasonably believed he was not free to leave. His request for a lawyer was not promptly honored. Admission of his statement was not harmless error even though there was other evidence linking him to the crime."

II. "Appellant sought to impeach the credibility of Yaneth Villanueva by questioning her about the possibly illicit source of the money she had hidden in her closet and about her claiming of Medicare benefits to which she was not entitled. The court granted the State's motion in limine on the ground that such questioning would amount to improper impeachment. The confrontation clause of the United States Constitution secures a defendant's right to cross-examination to establish a witness' bias, prejudice, or lack of credibility. The court's ruling deprived Appellant of this right."

III. "Appellant filed a motion for new trial on the ground that the jury verdict had been less than unanimous. A juror had said the guilty verdict was not hers when first polled, then said it was her verdict after further deliberation. Appellant offered witnesses to show the juror had been coerced by other jurors. Their testimony was excluded on grounds of hearsay and Rule 606(b), Tex. R. Evid. However, during trial the court had questioned the juror because she seemed inattentive and unable to follow the testimony. Coupled with evidence presented at the new trial hearing that the juror suffered from continuing mental confusion, the court should have found that she had not been a competent juror and hence granted a new trial."

IV. "The evidence was not legally sufficient to prove Appellant guilty of aggravated robbery beyond a reasonable doubt. The witnesses did not identify him and there was no direct evidence of his presence at the crime scene. Similarly, the evidence showed merely that Appellant had driven

94

the getaway car. No evidence was offered to show that he had knowingly entered into an agreement to assist the other suspects in committing an aggravated robbery."

*Fletcher v State*, No 01-15-00966-CR, 2016 WL 6962307 at *4–5 (Tex App [1st Dist] Nov 29, 2016).

As appellate counsel explained to Fletcher, the trial record consisted of testimony by law enforcement officers, whose versions of events differ from Fletcher's. Dkt 25-49 at 49. On appeal, appellate counsel was limited to the record at trial and could not bring in Fletcher's preferred version of facts because Fletcher did not testify at trial.

Even if appellate counsel rendered deficient performance by inadequately briefing these claims, Fletcher suffered no prejudice from counsel's performance because the record supports the appellate court's affirmation of the trial court's judgment. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law.

Ground 27 will be denied.

> d. Failing to raise and advance meritorious issues (Ground 28)

Fletcher argues that Lewis rendered ineffective assistance by failing "to raise and advance meritorious issues on appeal." Dkt 1 at 43–45. Fletcher contends that Lewis was ineffective for failing to argue as allegedly meritorious claims (i) the trial court's error in failing to conduct a hearing on the voluntariness of Fletcher's "custodial statement"; (ii) the trial court's error in failing to correct the State's "misleading misstatement of the law to the jury"; (iii) the trial court's improper "shift[ing] the burden of production to the defense"; (iv) the trial court's error in giving a "coercive supplemental *Allen* charge"; (v) the trial court's failure to enter findings in support of its ruling on the motion to suppress; and (vi) the trial court's failure to allow Fletcher to allocate. Id at 44–45.

Appellate arguments that assertedly should have been raised are considered by comparison to arguments that were raised. Declining to raise a claim on appeal isn't deficient performance unless that claim was plainly stronger than those actually presented to the appellate court. See *Davila v Davis*, 137 S Ct 2058, 2067 (2017); *Smith*, 528 US at 288.

Fletcher has not demonstrated that his appeal would have been likely to succeed had these claims been made, or that appellate counsel's allegedly deficient performance led to an unfair result. And, because Fletcher is not entitled to relief on the underlying claims, he cannot demonstrate that appellate counsel was ineffective for failing to raise them on direct appeal. See, for example, *Sones v Hargett*, 61 F3d 410, 415 n 5 (5th Cir 1995) ("Counsel cannot be deficient for failing to press a frivolous point"); *Koch v Puckett*, 907 F2d 524, 527 (5th Cir 1990) ("counsel is not required to make futile motions or objections").

Fletcher fails to demonstrate that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.

Ground 28 will be denied.

e.   Total failure to advocate on Fletcher's behalf (Ground 31)

Fletcher contends that his appellate counsel was ineffective for "total failure to advocate" on his behalf. Dkt 1 at 46. He points to all his ineffective assistance of appellate counsel claims in support. Ibid.

When a criminal defendant receives no meaningful assistance from his court-appointed lawyer, he is constructively denied his Sixth Amendment right to counsel and need not prove *Strickland* prejudice. "A constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the

defendant was in effect denied any meaningful assistance at all." *Jackson v Johnson,* 150 F3d 520, 525 (5th Cir 1998). Prejudice may only be presumed when counsel "was not merely incompetent but inert," and the Fifth Circuit distinguishes between "shoddy representation" and "no representation at all." *Childress v Johnson,* 103 F3d 1221, 1228–9 (5th Cir 1997). When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; "bad lawyering, regardless of how bad, does not support the presumption of prejudice." Id at 1229.

The record does not support Fletcher's contention that he was constructively denied the assistance of appellate counsel. And insofar as Fletcher's argument alleges that the cumulative errors of appellate counsel deprived him of a fair appeal, that claim fails. Because the alleged errors (Grounds 25 through 28) that Fletcher recites did not constitute deficient performance, they could not be the basis of a claim of cumulative prejudice. See *Miller v Johnson,* 200 F3d 274, 286 n 6 (5th Cir 2000). Moreover, the alleged errors did not so infect the appellate process with unfairness "as to render . . . a denial of due process." *Derden v McNeel,* 978 F2d 1453, 1454 (5th Cir 1992) (en banc).

Fletcher hasn't shown that the performance by his appellate counsel was deficient or that he was actually prejudiced as a result. *Strickland*, 466 US 668. The Texas Court of Criminal Appeals also denied this claim for ineffective assistance of appellate counsel without written order, meaning it affirmed the decision by the Fourteenth Court of Appeals. See Dkt 16-19 at 1; *Ex parte Torres*, 943 SW2d at 472. He hasn't shown that the decision of the state court was contrary to, or involved an unreasonable application of, clearly established federal law. He thus hasn't shown that he is entitled to *habeas corpus* relief on this claim. 28 USC § 2254(d)(1).

Ground 31 will be denied.

97

9.   Motion for evidentiary hearing

Fletcher seeks an evidentiary hearing as to his challenge to his conviction and sentence. See Dkt 59.

Rule 8 of the Rules Governing Section 2254 Cases states, "If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require." The reviewing court thus has discretion to reject the need for an evidentiary hearing. See *Conner v Quarterman*, 477 F3d 287, 293 (5th Cir 2007), citing *Roberts v Dretke*, 381 F3d 491, 497 (5th Cir 2004). Indeed, AEDPA reflects a congressional intent "to avoid unneeded evidentiary hearings" in federal proceedings on *habeas corpus* proceedings. *Williams v Taylor*, 529 US 420, 436 (2000). Section 2254(e)(2) of Title 28 thus provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

A federal *habeas corpus* petitioner can have an evidentiary hearing if a genuine factual dispute exists and the state hasn't afforded a full and fair hearing. *Clark*, 202 F3d at 766, quoting *Perillo v Johnson*, 79 F3d 441, 444

(5th Cir 1996). But a petitioner isn't entitled to a federal evidentiary hearing "if his claims are merely 'conclusory allegations unsupported by specifics' or 'contentions that in the face of the record are wholly incredible.'" *Young v Herring*, 938 F2d 543, 560 (5th Cir 1991), quoting *Blackledge v Allison*, 431 US 63, 74 (1977); see also *Washington v Davis*, 715 F Appx 380, 385 (5th Cir 2017, *per curiam*).

Fletcher presents nothing but conclusory assertions that he is illegally confined due to ineffective assistance of trial and appellate counsel as well as prosecutorial misconduct. Dkt 59. An evidentiary hearing isn't necessary where nothing establishes a pertinent factual dispute that requires development in order to assess the claims. *Robison v Johnson*, 151 F3d 256, 268 (5th Cir 1998). To the contrary, all issues raised in this case can be and have been resolved based on the pleadings.

The motion for evidentiary hearing will be denied. Dkt 59.

### 10. Certificate of appealability

Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner. A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right." 28 USC § 2253(c)(2). This requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v McDaniel*, 529 US 473, 484 (2000). Where the court denies relief based on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," and that they "would find it debatable whether the district court was correct in its procedural ruling." Ibid.

The Court finds that reasonable jurists wouldn't find this Court's assessment of the constitutional claims

debatable or wrong. As such, Fletcher hasn't made the necessary showing to obtain a certificate of appealability.

A certificate of appealability will be denied.

11. Conclusion

The pleadings and state court records show that the federal petition for a writ of *habeas corpus* brought by Petitioner Sam Autry Fletcher lacks merit.

The motion by Respondent Bobby Lumpkin for summary judgment is GRANTED. Dkt 50.

The petition by Fletcher for a writ of *habeas corpus* is DENIED. Dkt 1.

His motion for evidentiary hearing is DENIED. Dkt 59.

His motion for discovery is DENIED AS MOOT. Dkt 59.

His motion for the appointment of counsel is also DENIED AS MOOT. Dkt 60.

Any other pending motions are DENIED AS MOOT.

This case is DISMISSED WITH PREJUDICE.

A certificate of appealability is DENIED.

SO ORDERED.

Signed on September 29, 2023, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge

100